# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 04-2222 & 04-2493

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

*Plaintiff-Appellant*,

and

JUDITH KEANE,

*Intervening Plaintiff-Appellant*,

*v.*

SEARS, ROEBUCK & COMPANY,

*Defendant-Appellee.*

———————

Appeals from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 97 C 3971—**Charles R. Norgle, Sr.**, *Judge.*

———————

ARGUED MAY 10, 2005—DECIDED AUGUST 10, 2005

———————

Before FLAUM, *Chief Judge*, and KANNE and WILLIAMS,
*Circuit Judges.*

FLAUM, *Chief Judge.*    Under the Americans with
Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, an em-
ployer unlawfully discriminates against a "qualified indivi-

dual with a disability" when it fails to make "reasonable accommodations to the known physical or mental limitations" of the disabled employee, unless to do so would impose an "undue hardship" on the employer. §§ 12112(a), (b)(5)(A). The Equal Employment Opportunity Commission ("EEOC") filed suit against defendant-appellee Sears, Roebuck & Company ("Sears") for failing to reasonably accommodate the disability of its employee Judith Keane. Keane intervened and the district court granted summary judgment in favor of Sears, concluding that Keane was not disabled under the ADA. Keane and the EEOC appealed and, having found genuine issues of material fact as to whether Keane was disabled, we reversed. *See EEOC & Keane v. Sears Roebuck & Co. ("Keane I")*, 233 F.3d 432 (7th Cir. 2000). On remand, the district court concluded that the Supreme Court's decision in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), issued after our opinion in *Keane I*, changed the standard for determining whether an employee is disabled. The court considered Sears' renewed motion for summary judgment in light of *Toyota* and held, once again, that no reasonable jury could find that Keane was disabled. It went on to state that Sears also must prevail because Keane cannot establish any of the other elements of her failure to accommodate claim. Keane and the EEOC appeal a second time and, for the reasons stated herein, we again reverse.

## I. Background

In September 1992, Judith Keane began working at the Sears River Oaks department store in Calumet City, Illinois. As a sales associate in the intimate apparel department, Keane's tasks included handling purchases, assisting customers, sizing racks, and occasionally transporting money to and from cash registers. Keane's immediate supervisor was Jacqueline Klisiak, but when Klisiak

was absent, Keane reported to one of two supervisory co-workers, Shirley Oros or Tanya Branch. All management personnel reported to the store manager, David Allen.

In the summer of 1994, Keane began experiencing a numbness in her right leg. While the numbness did not affect her ability to walk short distances in her work area, it sometimes precluded her from taking longer walks such as those required to reach the employee cafeteria or the food court. Keane explained to Klisiak the difficulty she was having with her leg and asked if she could eat lunch in the intimate apparel stockroom. Although Klisiak initially agreed, she later announced a blanket policy forbidding all eating in the stockroom.

In the fall of 1994, as Keane's condition began to worsen, she asked Klisiak if she could walk through the shoe stockroom when going between the employee swipe-in area and the intimate apparel department. Keane explained that this shortcut would reduce by half the distance she had to walk at the beginning and end of each shift. Klisiak referred Keane to the shoe department manager, Joy Krumweide, who denied the request. Klisiak then went to David Allen on Keane's behalf, explained Keane's problem, and asked if Keane could use the stockroom shortcut. Allen refused.

Beginning in December 1994, Keane could walk no more than the equivalent of one city block without losing sensation in her leg. Once this happened, walking became "nearly impossible and extremely slow." Keane explained:

> I didn't know if I was going to make it out of the store all right. It was very, very difficult to walk, very difficult. . . . The more that I had to walk, which basically entailed parking and going in and out of the store, the more walking I had to do, the more numb the leg became. And the more difficult it—for instance, when I would come home from work, it would take a long time for that feeling to come back.

Keane eventually began using a cane when taking longer walks through the store. This, however, did not alleviate her symptoms or allow her to walk further.

In late December 1994, Keane was diagnosed with neuropathy, a general description of nerve damage, in addition to non-insulin-dependent diabetes. Keane's neurologist, Dr. Kathryn Hanlon, wrote a note stating that Keane should avoid walking long distances or for prolonged periods. Keane brought the note to work and, because Klisiak was not in, gave it to Shirley Oros who left it on Klisiak's desk. Klisiak found the note the following month. Klisiak knew that Keane's hours had been reduced at the end of the holiday season and decided, without discussing it with Keane, that the shortened schedule sufficiently limited Keane's walking. In fact, the change in hours had not helped Keane because her difficulties arose from walking to and from her work area, regardless of the length of her shifts. Klisiak put the doctor's note in Keane's personnel file without sharing it with anyone.

At some point, Klisiak gave Keane temporary permission to use the shoe stockroom as a shortcut. The first day Keane attempted to use it, however, Krumweide yelled at Keane to "get out of here." When Keane explained that Klisiak had given her permission, Krumweide screamed, "Jackie has no right to give you permission. This is my department." On another occasion, Keane approached the shoe stockroom and found a stock manager sitting on a stool at its entrance. The manager explained that Allen had taken her from her regular duties, posted her at the entrance, and instructed her to bar anyone from going through the door. Despite Keane's protests that she had Klisiak's permission to use the shortcut, the stock manager did not let Keane enter.

In another attempt to reduce her walking, Keane asked Allen if she could park in the merchandise pick-up lot near

the employee entrance. Allen denied that request but suggested that Keane park in a space reserved for people with disabilities outside of her department. Parking near Keane's department did not lessen her commute, however, because she still had to walk across the store to the employee swipe-in location and then walk back to her work area at the beginning and end of each shift.

By the spring of 1995, in addition to her right leg, Keane began to lose sensation in both feet when walking distances. As she described it, when "there is no feeling, [ ] it's almost as though you have to take both of your hands and lift up your leg and take one step at a time." At times, Keane had to hold on to the wall to avoid falling.

In April 1995, Allen asked Keane to have her doctor fill out a Sears' Physician Certification Form. He did not say that there was anything inadequate about her first doctor's note, indicate any specific information that was needed, or ask Keane what sort of accommodation she was seeking. Dr. Louis DePorter, Keane's general practitioner, completed the form, noting that Keane suffered from diabetes and from neuropathy in her right leg. He recommended that Keane limit excessive walking and be allowed "easy/short access to [her] job site." When Allen received the form, he assumed that because Keane was allowed to use the reserved parking space near her department, her request for accommodation had been fulfilled. Allen did not ask for, and Keane did not provide, additional medical information regarding her condition or the suitability of this arrangement. Allen told Klisiak to inform Keane that she would not be permitted to cut through the shoe stockroom. Although she was aware that the reserved parking space "seemed farther away"and that Keane would still have to walk around the building to the employee swipe-in location and then back to the intimate apparel department, Klisiak did not tell this to Allen.

In a meeting the following month, Klisiak told Keane that Allen had again denied her request to use the stockroom shortcut. In addition, Klisiak gave Keane a new work schedule which required her to work on Thursday evenings and Fridays. Although Keane protested that she had always been, and was then, unavailable to work on Thursday evenings and Fridays, Klisiak replied that the schedule could not be changed. Feeling that Sears had failed to accommodate her disability and was attempting to make her work environment inhospitable, Keane told Klisiak that the walking was too much for her and that she was going to have to resign. Klisiak described her own response in the following way: "I told her I was sorry to hear that; and I explained to her how to go about signing out in Personnel." Keane did not return.

The EEOC filed suit against Sears alleging that the company had failed to reasonably accommodate Keane's disability in violation of the ADA. After Keane intervened, she filed an amended complaint which further alleged that Sears had constructively discharged Keane from her position. Sears moved for summary judgment on both claims. The district court concluded that Keane was not disabled under the ADA and that she could not show that she had been subjected to conditions that were so intolerable as to require resignation. Accordingly, it granted Sears' motion as to both claims.

The EEOC and Keane appealed. We affirmed as to the constructive discharge claim and, finding genuine issues of material fact as to whether Keane was disabled, reversed summary judgment on the failure to accommodate claim. *See Keane I*, 233 F.3d at 441. We discussed "certain absences in the record" that were "important to point [ ] out, as their presence could assist a court in making a proper determination as to whether an individual is substantially limited in a major life activity, and thus disabled under the ADA," namely, the actual distance that Keane was able to

walk and her ability to walk compared to the average person. *Id.* at 439. We suggested that "a summary judgment determination is problematic" in the absence of such evidence. *Id.* Finally, we also noted that the district court had briefly mentioned alternative bases for summary judgment on the failure to accommodate claim. *Id.* at 440. We directed the court to conduct a "more searching analysis" of these potential grounds for summary judgment. *Id.*

On remand, the district court ordered the parties to supplement their statements of facts "to address the concerns expressed by the 7th Circuit." In doing so, the parties primarily reargued the facts that previously had been submitted. Keane emphasized evidence regarding the progression of her condition after she left Sears. According to Keane's supplemental statement of facts, Dr. Harris Barowsky concluded in the summer of 1997 that Keane had difficulty walking distances as short as 20 feet. In December of that year, Dr. David Rosenfeld concluded that Keane's "legs were weak," that "there was atrophy of leg muscles in the right leg," and that "the way she walked was very abnormal."

Thereafter, the district court granted Sears' renewed motion for summary judgment. *EEOC ex rel. Keane v. Sears, Roebuck & Co., Inc.*, No. 97 C 3971, 2004 WL 784803 (N.D. Ill. Apr. 12, 2004). In doing so, the court concluded that the standard for determining whether a plaintiff is "disabled" under the ADA had changed after *Keane I* with the Supreme Court's opinion in *Toyota*. The district court applied what it determined to be the new standard and found that no reasonable jury could find that Keane was disabled. It held in the alternative that summary judgment was warranted because Sears had provided Keane with a reasonable accommodation, Sears had not been aware of Keane's disability, and Keane caused the breakdown in the interactive process.

Keane and the EEOC appeal a second time, asserting that the district court exceeded its authority on remand by

"reopening" the issue of disability, and arguing that summary judgment was improper on each of the grounds cited by the district court.

## II. Discussion

### A. District Court's Authority on Remand

Keane argues that the district court exceeded its authority by "reopening" the issue of Keane's alleged disability. Whether a district court has acted outside of the scope of its authority on remand is a question of law that we review de novo. *United States v. White*, 406 F.3d 827, 831 (7th Cir. 2005).

As an initial matter, it cannot be doubted that a district court acts within its authority when it considers issues that we expressly have directed it to address. *Cf. United States v. Husband*, 312 F.3d 247, 251 (7th Cir. 2002). In *Keane I*, we stated that it was "necessary to remand this case for a more searching analysis" of whether "summary judgment was appropriate based on reasons other than Keane's classification as disabled." 233 F.3d at 440. Therefore, the portion of the district court's opinion in which it considered alternative bases for summary judgment is clearly within the scope of the remand.

Despite our holding in *Keane I* that a genuine issue of fact exists as to whether Keane is disabled, the district court also acted within its authority in reconsidering this issue. In general, any issue conclusively decided by this Court on appeal may not be reconsidered by the district court on remand. *Husband*, 312 F.3d at 251. This is based upon both the law of the case doctrine, which "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages *in the same case*," *Jarrard v. CDI Telecomms., Inc.*, 408 F.3d 905, 911-12 (7th Cir. 2005) (quoting *Christianson v. Colt Indus.*

*Operating Corp.*, 486 U.S. 800, 815-16 (1988)) (emphasis in *Jarrard*), and the mandate rule, which "requires a lower court to adhere to the commands of a higher court on remand," *United States v. Polland*, 56 F.3d 776, 777 (7th Cir. 1995). *See White*, 406 F.3d at 831. Neither rule is inflexible, however. "An appellate mandate does not turn a district judge into a robot, mechanically carrying out orders that become inappropriate in light of subsequent factual discoveries or changes in the law." *Barrow v. Falck*, 11 F.3d 729, 731 (7th Cir. 1993). Similarly, the law of the case doctrine permits "a court to revisit an issue if an intervening change in the law, or some other special circumstance, warrants reexamining the claim." *United States v. Thomas*, 11 F.3d 732, 736 (7th Cir. 1993). Our decisions do not bind the district court when there has been a relevant intervening change in the law. *See Page v. United States*, 884 F.2d 300, 302 (7th Cir. 1989).

When considering a district court's authority to reexamine an issue resolved in an earlier appeal, we ask only whether the district court reasonably concluded that there has been a relevant change in the law, not whether there in fact has been such a change. If, on appeal, we disagree with the district court's determination that an intervening case has changed the law in a relevant way, we may reverse to correct the misinterpretation itself, but we will not find that the district court exceeded its authority in reconsidering the issue if its analysis of the intervening case was reasonable. Here, the district court reasonably concluded that the issue of Keane's alleged disability resolved in *Keane I* required reexamination in light of the Supreme Court's decision in *Toyota*. Accordingly, it acted within its authority in addressing the issue on remand.

## B. Summary Judgment

We review the district court's grant of summary judgment de novo, viewing all facts and drawing all reasonable

inferences in the non-moving party's favor. *Eisencorp, Inc. v. Rocky Mountain Radar, Inc.*, 398 F.3d 962, 965 (7th Cir. 2005). Summary judgment is appropriate if the evidence presented by the parties "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 950 (7th Cir. 2000).

The ADA provides that a covered employer shall not "discriminate against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). "Discrimination," under the ADA, includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business." § 12112(b)(5)(A). Thus, the ADA requires employers to reasonably accommodate the limitations of its disabled employees. *See Toyota*, 534 U.S. at 193.

To establish a claim for failure to accommodate, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability. *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001). As to the third element, the "ADA requires that employer and employee engage in an interactive process to determine a reasonable accommodation." *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633 (7th Cir. 1998). If a disabled employee shows that her disability was not reasonably accommodated, the employer will be liable only if it bears responsibility for the breakdown of the interactive process. *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996).

The district court granted summary judgment on four grounds. It held that: (1) Keane was not disabled when she worked for Sears; (2) if Keane was disabled, Sears reasonably accommodated her disability; (3) if Sears did not reasonably accommodate Keane's disability, this was because Sears was not aware of the disability; and (4) if Sears was aware of Keane's disability, Sears cannot be liable because Keane caused the breakdown of the interactive process. *EEOC ex rel. Keane*, 2004 WL 784803, at *10. To prevail on appeal, Keane must show that there is a genuine issue of material fact as to each of these issues.

### 1. Disability

The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The parties agree that Keane was able to perform the essential functions of her position at Sears. The district court held, however, that as a matter of law Keane was not disabled.

The ADA defines "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

§ 12102(2). In this case, we are concerned only with the first definition, under which we conduct a three-step inquiry, asking whether the plaintiff's condition constitutes an impairment under the ADA, whether the activity upon which the plaintiff relies constitutes a major life activity, and whether the impairment substantially limited the per-

formance of the major life activity. *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998). The parties agree that Keane's neuropathy is a physical impairment and that walking is a major life activity within the meaning of the Act. We therefore proceed directly to the third step and review the district court's conclusion that no reasonable jury could find that Keane's neuropathy "substantially limited" her ability to walk during the time she worked at Sears.

In *Keane I*, we held that there was a genuine issue for the jury on this question. We cited the EEOC's regulation defining "substantially limits" in our analysis:

The term substantially limits means:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) *Significantly restricted* as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1) (emphasis added).

On remand, the district court determined that the Supreme Court's intervening decision in *Toyota* changed the definition of "substantially limits." *EEOC ex rel. Keane*, 2004 WL 784803, at *6. *Toyota* held that "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or *severely restricts* the individual from doing activities that are of central importance to most people's daily lives." 534 U.S. at 198 (emphasis added). The district court concluded that courts may no longer rely upon § 1630.2(j)'s "significantly restricted" language, and that the Supreme Court set a higher threshold by using the phrase "severely restricts." *EEOC ex*

*rel. Keane*, 2004 WL 784803, at \*\*5-6. According to the district court, the proper inquiry under *Toyota* is whether Keane was "*severely* limited in performing a major life activity." *Id.* at \*6 (emphasis in original). The court found that Keane was not disabled under this new standard. *Id.* at \*\*7-8. In reviewing the district court's decision, we must start with *Toyota*.

In *Toyota*, the plaintiff, claiming to be disabled because of her carpal tunnel syndrome and other related conditions, sued her former employer for failing to provide her with a reasonable accommodation in her factory assembly-line job. 534 U.S. at 187. The district court granted summary judgment to the employer but the Sixth Circuit reversed and granted partial summary judgment to the plaintiff on the issue of whether she was disabled under the ADA. *Id.* The Sixth Circuit found that her impairments substantially limited her in the major life activity of performing manual tasks. *Id.* The Supreme Court granted certiorari "to consider the proper standard for assessing whether an individual is substantially limited in performing manual tasks." *Id.* at 192.

The Court considered the potential sources of guidance for interpreting the terms "substantially limits" and "major life activity."[1] *Id.* at 193-94. The latter is defined in the regulations interpreting the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, which were issued by the Department of Health, Education, and Welfare ("HEW") in 1977, and which appear in the current regulations issued by the Department of Health and Human Services. *See id.* These regulations are of particular significance because, at the time they were issued, HEW was the agency responsible for coordinating the implementation and enforcement of § 504

---

[1] The parties in *Toyota* agreed that the plaintiff's medical conditions constituted "impairments" under the Act.

of the Rehabilitation Act, 29 U.S.C. § 794, which prohibits discrimination against individuals with disabilities by recipients of federal financial assistance. *Id.* at 195. Congress expressly provided that these regulations would be of continuing importance in interpreting the ADA:

> Except as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. § 790 et seq.) or the regulations issued by Federal agencies pursuant to such title.

42 U.S.C. § 12201(a). Therefore, the HEW regulation's list of "major life activities," which includes "performing manual tasks, walking, seeing, [and] hearing," is persuasive authority in applying the ADA. *Toyota*, 534 U.S. at 194-95.

The HEW regulations, however, do not define the term "substantially limits." *Id.* at 195. Therefore, the Court in *Toyota* looked to the EEOC's regulations, but noted that their persuasive authority "is less clear." *Id.* at 194. Congress divided among several agencies the authority to issue regulations to implement Titles I through V of the ADA. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 478-79 (1999). "No agency, however, has been given authority to issue regulations implementing the generally applicable provisions of the ADA, see §§ 12101-12102, which fall outside of Titles I-V," including § 12102(2)'s definition of "disability." *Id.* at 479; *Toyota*, 534 U.S. at 194. Nonetheless, the EEOC, which has authority to issue regulations to carry out the employment provisions of Title I, has issued regulations interpreting each component of the term "disability": "impairment," "substantially limits," and "major life activities." *Sutton*, 527 U.S. at 479; *Toyota*, 534 U.S. at 194.

The Court in *Toyota* quoted in its entirety the EEOC's interpretation of "substantially limits" in 29 C.F.R.

§ 1630.2(j), which includes the "significantly restricted" language, and stated that because both parties accepted that this and other regulations were reasonable, it "assume[d] without deciding that they are" and concluded that the Court had "no occasion to decide what level of deference, if any, they are due." *Id.* at 194-96. While the Court assumed that § 1630.2(j) was reasonable, it focused on the statutory language itself, noting that "substantially" suggests "considerable" or "to a large degree" and "clearly precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities." *Id.* at 196-97. For the last proposition, it quoted with approval its statement in *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555 (1999), that " 'mere difference' does not amount to a 'significant restrict[ion]' and therefore does not satisfy the EEOC's interpretation of 'substantially limits.' " *Toyota*, 534 U.S. at 197 (quoting *Albertson*'s, 527 U.S. at 565) (alterations in *Toyota*). Citing again to the regulation, the Court concluded:

> We therefore hold that to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term.

*Id.* at 198.

In applying this interpretation of "substantially limits" to the specific facts of the case, the *Toyota* Court explained that when the major life activity involved is the ability to perform manual tasks, the plaintiff must show more than that she is "unable to perform the tasks associated with her specific job"; the issue is "whether the claimant is unable to perform the variety of tasks central to most people's daily lives." *Id.* at 200-02. The plaintiff in *Toyota* was not only unable to raise her arms in the way required to perform a

specific job in the factory where she worked, but her condition also caused her to avoid sweeping, to quit dancing, occasionally to seek help dressing, and to reduce how often she plays with her children, gardens, and drives long distances. *Id.* at 202. Nevertheless, she was able to brush her teeth, wash her face, bathe, tend her flower garden, fix breakfast, do laundry, and pick up around the house—tasks the Court found to be more central to daily life than the tasks she could not perform. *Id.* The Court concluded that the plaintiff's limitations "did not amount to such severe restrictions in the activities that are of central importance to most people's daily lives that they establish a manual task disability as a matter of law." *Id.* It reversed the court of appeals' grant of partial summary judgment in favor of the plaintiff and remanded for further proceedings. *Id.* at 202-03. It did not direct that summary judgment be entered for the defendant.

Sears essentially makes two arguments on appeal: (1) *Toyota*'s use of the phrase "severely restricts" means that courts may no longer seek guidance from § 1630.2(j), which defines "substantially limits" as "unable to perform" or "significantly restricted" in performing a major life activity; and (2) the Supreme Court raised the disability threshold so that, while there was a genuine issue of material fact as to whether Keane was disabled before *Toyota*, under the new standard Keane was not disabled as a matter of law. The Supreme Court's handling of § 1630.2(j) in *Toyota* makes clear that Sears' first assertion is incorrect. The Court quoted § 1630.2(j) fully, assumed that it was reasonable, expressly referred to the regulation in its analysis, and favorably cited its own reliance upon the "significantly restricts" language in *Albertson*'s. *Id.* at 195-97 (quoting *Albertson*'s, 527 U.S. at 565). Nothing in the Court's opinion suggests that it intended to preclude lower courts from seeking guidance from § 1630.2(j). If it had intended to bar future reference to the EEOC's regulations interpreting

"disability," the Court first would have addressed the question of what, if any, deference they are due. It specifically declined to do so.

Before today, we have not had the occasion to consider directly whether *Toyota* precludes continuing reference to § 1630.2(j). We and many of our sister circuits, however, have continued to seek guidance from this regulation in interpreting "substantially limits" after *Toyota. See, e.g., Kupstas v. City of Greenwood*, 398 F.3d 609, 612-13 (7th Cir. 2005); *Emory v. AstraZeneca Pharm. LP*, 401 F.3d 174, 179-80 (3d Cir. 2005); *Albert v. Smith's Food & Drug Ctrs., Inc.*, 356 F.3d 1242, 1250-51 (10th Cir. 2004); *Rossbach v. City of Miami*, 371 F.3d 1354, 1357 (11th Cir. 2004); *Ristrom v. Asbestos Workers Local 34 Joint Apprentice Comm.*, 370 F.3d 763, 768-69 (8th Cir. 2004); *Wright v. CompUSA, Inc.*, 352 F.3d 472, 476 (1st Cir. 2003); *Regional Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 47-48 (2d Cir. 2002); *Pollard v. High's of Balt., Inc.*, 281 F.3d 462, 467-68 (4th Cir. 2002); *Black v. Roadway Express, Inc.*, 297 F.3d 445, 448-49 (6th Cir. 2002); *EEOC v. United Parcel Serv., Inc.*, 306 F.3d 794, 801 (9th Cir. 2002). While we do not express an opinion on the level of deference due to the EEOC's regulations interpreting "disability" (the question reserved by the Supreme Court), we conclude that *Toyota* does not prevent courts from looking to them for guidance.

Although the Supreme Court did not forbid reference to the EEOC's regulations, it did seem to caution against letting them obscure the ADA's "demanding standard for qualifying as disabled." *See Toyota*, 534 U.S. at 197. The Court indicated that, rather than turning immediately to interpretive regulations, it is best to start with the statutory language itself. *See id.* at 195-97 (quoting 29 C.F.R. § 1630.2(j) but returning to consider the statutory language itself). The *Toyota* Court asked whether the plaintiff's impairment "substantially limited" her ability to perform a

major life activity, noting that this language suggests that the activity must be limited "considerably" or "to a large degree," and not merely in a "minor way." *Id.* at 196-97. In addition, the limitation must be considered in light of that which most people do in their daily lives, not with reference to a specific job. *Id.* at 199-200; *see also Mack v. Great Dane Trailers*, 308 F.3d 776, 781 (7th Cir. 2002) ("*Toyota*'s point was that an inability to perform 'occupation-specific' tasks does not necessarily show an inability to perform the central functions of daily life."). The use of the phrase "severely restricts" further underscores that the standard must remain demanding and not be weakened through reference to regulations or otherwise. In this way, the Supreme Court in *Toyota* may have set a "higher threshold for the statute than some had believed it contained." *Dvorak v. Mostardi Platt Assocs., Inc.*, 289 F.3d 479, 484 (7th Cir. 2002). It did not, of course, alter the statutory prescription applied in *Keane I* that, to be disabled, one's impairment must "substantially limit" a major life activity. It also did not change the way in which courts are to go about making this determination—asking whether the limitation is substantial or considerable in light of what most people do in their daily lives, and whether the impairment's effect is permanent or long term.

While this admonition to remain faithful to the strict statutory requirements of the ADA applies with equal force to all claims under the Act, there are some aspects of *Toyota* which are less broadly applicable. The Supreme Court expressly limited its grant of certiorari, its analysis, and its holding, to the major life activity of performing manual tasks. This is important in analyzing its statement that "[w]hen addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives," and considering the weight the Court gave to the plaintiff's ability to brush her teeth, wash

her face, bathe, tend her flower garden, fix breakfast, do laundry, and pick up around the house. *Toyota*, 534 U.S. at 200, 202. The ability to perform these types of tasks is much less telling when considering the major life activity of walking. The ability of a person who is wheelchair-bound to wash his face or pick up around the house does not indicate that he is not disabled under the ADA, and it would not relieve his employer of the obligation to install a ramp or reasonably accommodate his limitations in other ways. The requirement that a plaintiff be unable to perform a "variety of tasks" like the ones discussed in *Toyota* may not apply where the major life activity at issue is something other than the performance of manual tasks. *See Albert v. Smith's Food & Drug Ctrs., Inc.*, 356 F.3d 1242, 1250 n.5 (10th Cir. 2004) (explaining that *Toyota* was concerned only with the major life activity of performing manual tasks and "did not set down the rule that all people claiming a disability must show an inability to preform the variety of tasks required to be performed in most people's daily lives," and holding that the requirement did not apply where the major life activity at issue is breathing); *cf. Rooney v. Kock Air, LLC*, 410 F.3d 376, 380-81 (7th Cir. 2005) (applying the "variety of tasks" requirement where the plaintiff "never testified that he was unable to perform any major life activities" and only asserted that he could not perform some of the tasks specific to his job).

To be disabled with regard to the major life activity of walking, the employee must be "substantially limited" in her ability to walk, and the limitation must be permanent or long term, and considerable compared to the walking most people do in their daily lives. Here, the evidence taken in the light most favorable to Keane demonstrates that when she worked at Sears she was unable to walk the equivalent of one city block without her right leg and feet becoming numb. When this happened, walking became "nearly impossible and extremely slow." She would feel as

though she had to take both of her hands and lift up her leg to take one step at a time. Sometimes, Keane would doubt whether she could make it out of the store safely and would hold on to the wall for support. There is no evidence that Keane's impairment was temporary or short term. In fact, by the summer of 1997, two years after Keane left Sears, her condition had deteriorated to the point that she had difficulty walking even 20 feet. As we noted in *Keane I*, "[t]hough the progression of Keane's impairment subsequent to her resignation from Sears does not factor directly into the analysis of whether Keane was disabled when she was employed by Sears, we believe that her [subsequent condition] does provide a certain degree of credence to the claim that her neuropathy may have been 'substantially limiting' at the time at issue." *Keane I*, 233 F.3d at 438. In addition, it demonstrates that her condition was not fleeting. A reasonable jury could conclude, based on this evidence and its own life experience, that Keane's severe difficulty in walking the equivalent of one city block was a substantial limitation compared to the walking most people do daily. Accordingly, the district court erred in concluding that no reasonable jury could find that Keane was disabled under the ADA.

### 2. Reasonable Accommodation

Under the ADA, an employer must make "reasonable accommodations" to a disabled employee's limitations, unless the employer can demonstrate that to do so would impose an "undue hardship." 42 U.S.C. § 12112(b)(5)(A). Sears does not contend that accommodating Keane's disability would have imposed upon it an undue hardship. Rather, it argues, and the district court held, that Sears provided Keane with reasonable accommodations.

Reasonable accommodations under the ADA include "making existing facilities used by employees readily accessible to and usable by individuals with disabilities."

§ 12111(9). "It is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests." *Jay v. Intermet Wagner, Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000). Still, at the very least, the employer is obliged to provide an accommodation that effectively accommodates the disabled employee's limitations. *See US Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002) ("An *ineffective* 'modification' or 'adjustment' will not *accommodate* a disabled individual's limitations.") (emphasis in original). The parties agree that Keane was able to perform all of the aspects of her job but simply had trouble getting to and from her workstation within the store. If Sears was effective in making its facility "readily accessible to and usable by" Keane, then it is not liable. *See* 42 U.S.C. § 12111(9)(A); *see also Vande Zande v. State of Wisc. Dep't of Admin.*, 44 F.3d 538, 546 (7th Cir. 1995) ("The duty of reasonable accommodation is satisfied when the employer does what is necessary to enable the disabled worker to work in reasonable comfort.").

In concluding that Sears reasonably accommodated Keane's limitations, the district court relied upon Keane's use of the parking space reserved for people with disabilities near her work area, her use of the intimate apparel stockroom to eat lunch, and her use of the shoe stockroom shortcut "for a period of time." *EEOC ex rel. Keane*, 2004 WL 784803, at *10. Whether considered individually or together, these do not constitute a reasonable accommodation when the evidence is viewed in the light most favorable to Keane.

As to the use of the reserved parking space, a reasonable jury could conclude that this did nothing to make the Sears facility "readily accessible to and usable by" Keane. Keane's limitations made it difficult for her to walk from her car to the employee swipe-in area and then to her department. Use of the reserved parking space near her department did

not reduce the distance she had to walk before and after each shift because it required her to walk back and forth across the store to reach the employee swipe-in area. A reasonable jury could find that, because it did not effectively accommodate Keane's limitations, this was not a reasonable accommodation.

As to Keane eating in the intimate apparel stockroom and using the shoe stockroom shortcut "for a period of time," a jury could conclude that these did not make the facility accessible to Keane because the accommodations were either rescinded or Keane faced reprimand when she tried to used them. Although Klisiak initially gave Keane permission to eat in the stockroom, she later announced a blanket policy forbidding it. In addition, even if Keane had been permitted to continue to eat in the stockroom, this would not have alleviated her difficulty getting to and from her work area at the beginning and end of each shift. Similarly, while Klisiak gave Keane temporary permission to cut through the shoe stockroom, Allen told her she could not. When Keane tried to use the shortcut, Krumweide yelled at her and another employee was stationed at the entrance to prevent her from entering. A jury could conclude that these were not reasonable accommodations because they did not consistently or effectively make the Sears facility accessible to Keane. The district court erred in granting summary judgment on this basis.

### 3. Awareness of Keane's Disability

An employer only violates the ADA if it fails to provide "reasonable accommodations to the *known* physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A) (emphasis added). Thus, a plaintiff alleging a failure to accommodate, "in addition to showing that she is a qualified individual with a disability, must show that the employer was aware of her

disability and still failed to reasonably accommodate it." *Hoffman*, 256 F.3d at 572. This duty is "dictated by common sense lest a disabled employee keep his disability a secret and sue later for failure to accommodate." *Beck*, 75 F.3d at 1134.

The ADA imposes on an employee the "initial duty to inform the employer of a disability." *Id.* This initial duty, however, requires at most that the employee indicate to the employer that she has a disability and desires an accommodation. *See id.*; *see also Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000) ("Although there will be exceptions to the general rule . . . we believe that the standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches."); *Bultemeyer v. Fort Wayne Comm. Schs.*, 100 F.3d 1281, 1285-86 (7th Cir. 1996) (employee with a mental illness may not need to explicitly request an accommodation; "if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help."). Thereafter, the employer and the employee must work together through an "interactive process" to determine the extent of the disability and what accommodations are appropriate and available. *See Beck*, 75 F.3d at 1134-36. Where notice is ambiguous as to the precise nature of the disability or desired accommodation, but it is sufficient to notify the employer that the employee may have a disability that requires accommodation, the employer must ask for clarification. *See Bultemeyer*, 100 F.3d at 1285. In other words, an employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance, or by intentionally remaining in the dark.

Viewing the evidence in the light most favorable to Keane, a reasonable jury could conclude that Sears was sufficiently aware of Keane's disability to trigger the interactive process. Keane gave to Sears notes from two doctors indicating

that she suffered from neuropathy and recommending that she be permitted to avoid walking long distances. In addition, Keane told Oros (a supervisory co-worker), Klisiak (the department supervisor), and Allen (the store manager) that she wished to use the shortcut through the shoe stockroom because the long walk through the store was difficult for her. Klisiak was sufficiently aware of Keane's condition to tell Allen that Keane "was having problems with her legs" and wanted permission to use the shortcut. Thus, supervisors at three levels of Sears management were aware that Keane suffered from neuropathy which made it difficult for her to get to her work area and knew the specific accommodation she was seeking. A jury could conclude that Sears was aware of Keane's condition and her desire to be accommodated, thus triggering Sears' obligation to engage in the interactive process.

In reaching the opposite conclusion, the district court relied on *Steffes v. Stepan Co.*, 144 F.3d 1070 (7th Cir. 1998). In that case, we assumed that the employee's doctor's note stating that she could not be exposed to chemicals was sufficient to provide initial notice. 144 F.3d at 1072. Although we went on to conclude that the employee was responsible for the breakdown of the interactive process when she failed to "update or further clarify the kinds of work she could do and the level of chemical exposure, if any, she could tolerate," this is irrelevant to the question of a plaintiff's initial notice obligation. *See id.* The employee's responsibility to provide additional information arose within the interactive process and after the employer had sought clarification of the nature of employee's disability and whether proposed accommodations would meet the employee's needs. We did not hold in *Steffes*, as the district court suggested, that an employee must make the employer "aware of the full extent of [the employee's] disability" to trigger the interactive process. *EEOC ex rel. Keane*, 2004 WL 784803, at *9.

Sears worries that it would have been inappropriate, and possibly discriminatory, for it to have assumed that Keane was disabled just because she brought in doctors' notes, walked with a limp, and used a cane. True, assumptions are not what the ADA requires. Rather, it obligates an employer to engage in the interactive process precisely for the purpose of allowing both parties to act upon information instead of assumptions. Here, Keane not only provided doctor's notes disclosing her diagnosis and limitations, but she requested a specific accommodation. Once Keane raised the issue in this way, it was not only appropriate for Sears to ask questions, but Sears was required to engage with Keane in deciding upon an appropriate accommodation. The district court erred in finding that Sears is entitled to judgment as a matter of law on this issue.

### 4. Breakdown of the Interactive Process

After an employee's initial disclosure, "the ADA obligates the employer to engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th Cir. 2000) (internal quotations omitted). "Failure to engage in this 'interactive process' cannot give rise to a claim for relief, however, if the employer can show that no reasonable accommodation was possible." *Hansen v. Henderson*, 233 F.3d 521, 523 (7th Cir. 2000). Therefore, we ordinarily look first to whether there is a genuine issue of material fact regarding the availability of a reasonable accommodation, and if it is clear that no reasonable accommodation was available, we stop there. *See Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001); *see also Mays v. Principi*, 301 F.3d 866, 870 (7th Cir. 2002) ("The plaintiff cannot seek a judicial remedy for the employer's failure to accommodate her disability without showing that a reasonable accommodation existed."). Here, both parties agree

that several reasonable accommodations were available, including use of the stockroom shortcut and moving Keane to a department closer to the employee swipe-in area. Therefore, we may proceed directly to consideration of whether one party was responsible for the breakdown in the interactive process. *See Ozlowski*, 237 F.3d at 840.

According to an EEOC regulation, the purpose of the interactive process is to "identify the precise limitations resulting from the disability and potential reasonable ac-commodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). This step imposes a duty on employers to engage in a flexible give-and-take with the disabled employee so that together they can determine what accom-modation would enable the employee to continue working. *Gile*, 213 F.3d at 373. If this process fails to lead to rea-sonable accommodation of the disabled employee's limita-tions, responsibility will lie with the party that caused the breakdown:

> No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to partici-pate in good faith or failure by one of the parties to make reasonable efforts to help the other party deter-mine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communi-cate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Beck*, 75 F.3d at 1135.

Sears argues that no reasonable jury could find that it caused the breakdown of the interactive process because Keane quit, "precluding any discussion of alternatives." The district court adopted this reasoning and assumed that

Keane's departure was the cause of the breakdown without considering the parties' respective involvement in the process up to that point. The last act in the interactive process is not always the cause of a breakdown, however, and courts must examine the process as a whole to determine whether the evidence requires a finding that one party's bad faith caused the breakdown. *See, e.g., Beck*, 75 F.3d at 1135-36.

Our cases illustrate that when an employer takes an active, good-faith role in the interactive process, it will not be liable if the employee refuses to participate or withholds essential information. For example, in *Beck*, we affirmed a grant of summary judgment in favor of the University of Wisconsin where a secretary suffering from osteoarthritis and depression stood in the way of the University's "numerous steps" to accommodate her. *Id.* at 1136-37. The parties had several formal and informal meetings in which they discussed possible accommodations. Regarding her osteoarthritis, Beck requested a reduction of her repetitive keyboard use and suggested that an adjustable computer keyboard would be helpful. The University responded to both requests, substantially reducing Beck's workload and providing her with a wrist rest. Beck never sought additional or different accommodations for her osteoarthritis. As to her depression, the University knew that Beck believed her overall workload was too high. Upon returning from her first of several leaves of absence, Beck was given a new position in which she was permitted to merely practice a word-processing program for the first few months. Upon returning from a third leave, the University assigned Beck to work with only one supervisor and reduced her workload to substantially less than other secretaries. When Beck complained that the workload was too low, the University gave her additional assignments. We summarized: "At no point did the University fail to respond in some manner to Beck's requests for accommodation, and there is nothing in

the record from which we can discern any attempt by the University to sweep the problem under the rug." *Id.* at 1136. We concluded that, because the University made "reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed," it could not be responsible for the breakdown of the interactive process. *Id.* at 1137.

In *Jackson v. City of Chicago*, a police officer who had been on disability leave claimed that the city failed to engage in the interactive process when she asked to return to work. ___ F.3d ___, 2005 WL 1618822 (7th Cir. 2005). The city sent several letters to the plaintiff asking for a description of the extent of her limitations. *Id.* at *6. The plaintiff responded with uninformative statements, such as "Officer Jackson is not claiming that she is physically unable to return to work. She is asking to be reinstated." *Id.* Given the plaintiff's failure to respond to the employer's specific requests for information, we found that the plaintiff had caused the breakdown in the interactive process. *Id.*

In addition to holding employees to their obligation to fully participate in the interactive process, our cases also demonstrate that if the employee has requested an appropriate accommodation, the employer may not simply reject it without offering other suggestions or at least expressing a willingness to continue discussing possible accommodations. This reflects the give-and-take aspect of the interactive process. An employer cannot sit behind a closed door and reject the employee's requests for accommodation without explaining why the requests have been rejected or offering alternatives. In *Gile v. United Airlines, Inc.*, we concluded that the employer "flunked its obligations under the ADA" when, in the face of the employee's repeated pleas for a shift transfer, it refused the request and then did nothing to engage with the employee in determining if any alternative accommodations would be appropriate. 213 F.3d 365, 373 (7th Cir. 2000). Although the employer believed

that the employee's proposed accommodation would have been ineffective, it "had the affirmative obligation to seek [the employee] out and work with her to craft a reasonable accommodation." *Id.* We concluded that the employer "failed its duty of reasonable accommodation because it took no action other than to reject [the employee's] request." *Id.* at 374.

Here, while Keane may not have articulated to Sears all of the details of her disability, she discussed with her supervisors the difficulty she was having in reaching her work area and requested a specific accommodation, namely, use of the stockroom shortcut. Sears was not obligated to provide this accommodation, but it also could not simply reject the request and take no further action. A reasonable jury could conclude, however, that this is exactly what happened.

The evidence taken in the light most favorable to Keane demonstrates that she made several requests for accommodations which Sears simply denied. Keane asked Klisiak if she could eat lunch in the intimate apparel stockroom. Although Klisiak initially gave Keane permission to do so, when she later announced a blanket policy forbidding all eating there, Keane believed that this applied to her as well. On several occasions, Keane asked various managers if she could use the shoe stockroom shortcut. Krumweide and Allen denied each request. While Klisiak gave Keane temporary permission to use the shortcut, Krumweide yelled at Keane when Keane tried to do so. When Keane asked Allen if she could park in the merchandise pick-up lot, he denied the request and offered to let her park in a reserved space near her department even though Klisiak, who was acting as the intermediary between Allen and Keane, understood that this would not shorten Keane's walk. Allen later denied Keane's request to use the stockroom shortcut a second time, again assuming, without asking Keane, that use of the reserved space was sufficient.

Thereafter, Keane told Klisiak that the walking was too much for her and that she was going to have to resign. Klisiak simply responded that she was sorry to hear this and explained to Keane how to sign out.[2]

Keane is unlike the plaintiffs in *Beck* and *Jackson* who made no specific requests for accommodations and failed to respond to their employers' inquiries. In addition, Sears is unlike the defendants in those cases because it did not actively engage in the interactive process by suggesting possible accommodations or requesting information that would help it do so. Instead, as in *Gile*, Keane requested accommodations, Sears denied her requests, and then Sears disengaged from the process. A reasonable jury could find that Sears' *only* communication to Keane, apart from its

_____

[2] Sears includes an additional fact in its brief: "Significantly, [Keane] told Klisiak that she would try something else, i.e., that she believed there was another option." (Sears Br. at 26.) Sears cites to Keane's deposition testimony about her statements to Klisiak after she was told that Allen had again denied her request to use the stockroom shortcut: "I said I was disappointed. I told her that there was something I was going to try or I had tried rather, and that was that procedure that I had mentioned about pulling up and going in, back and forth. I said I don't know if that's going to work." (Keane Dep. at 234.) It is clear from the surrounding context that the "procedure" to which Keane referred was her own experiment with pulling up in front of the employee entrance, going into the store to swipe in, getting back in her car, and driving to the reserved parking space near her department.

Read in the light most favorable to Keane, her testimony cannot be understood as a statement that she "believed there was another option," or that she was telling Klisiak that this "procedure" would accommodate her disability. Furthermore, Klisiak testified that she knew that the "procedure" would probably require walking an even longer distance than if Keane parked in the employee lot, walked to the swipe-in area, and then walked to her work area. (Klisiak Dep. at 176.) This is not evidence of Sears' meaningful participation in the interactive process.

denials of her requests, was the suggestion that she use the reserved parking space which Klisiak knew would do nothing to facilitate Keane's access to her work area. This is not meaningful participation in the interactive process.

Sears argues that Keane should have said to someone "[y]ou have not gotten back to me" when it failed to respond to her requests for accommodations. It is not an employee's responsibility, however, to repeatedly prod a reticent employer. Keane was given no indication that Allen or anyone else at Sears was willing to work with her to determine a way to reasonably accommodate her disability. In this context, Sears cannot avoid liability by contending that Keane should have tried harder to force it out of its reluctant posture.

Viewing the evidence in the light most favorable to Keane, a reasonable jury could conclude that Sears caused the breakdown in the interactive process by failing to engage in a meaningful way despite Keane's repeated requests. Accordingly, the district court erred in granting summary judgment in favor of Sears on this basis.

### III. Conclusion

Our task has not been to determine whether Keane was disabled when she worked at Sears, whether Sears was aware of her disability, whether Sears reasonably accommodated Keane's disability, or which party caused the breakdown of the interactive process. Rather, we have merely concluded that there is sufficient evidence to allow each of these questions to be presented to a jury. Accordingly, we REVERSE the entry of summary judgment in favor of defendant-appellee Sears and REMAND for proceedings consistent with this opinion.

A true Copy:

      Teste:

               _____

               ***Clerk of the United States Court of
Appeals for the Seventh Circuit***