In the

# United States Court of Appeals
## For the Seventh Circuit

No. 17-3534 & No. 17-3632

ANTHONY SANSONE,

*Plaintiff-Appellee,*

*v.*

MEGAN J. BRENNAN, Postmaster General of the United States,

*Defendant-Appellant.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:13-cv-03415 — **Milton I. Shadur**, *Judge,*
and **Virginia M. Kendall**, *Judge.*

ARGUED SEPTEMBER 25, 2018 — DECIDED MARCH 6, 2019

Before KANNE, ROVNER, and BARRETT, *Circuit Judges.*

BARRETT, *Circuit Judge.* Tony Sansone, who is confined to a wheelchair, needs a parking place with room to deploy his van's wheelchair ramp. For years, the Postal Service, his employer, provided him one. But in 2011, it took that spot away and failed to provide him with a suitable replacement. Sansone then retired and sued the Service under the Rehabilitation Act for failing to accommodate his disability.

A jury returned a verdict in his favor and Sansone recovered compensatory damages, as well as back and front pay.

The Service asks us to vacate the district court's judgment because of two jury instructions: one about an employee's obligation to cooperate with his employer in identifying a reasonable accommodation and the other about how the jury should evaluate the Service's expert witness. We hold that the district court did not err with respect to the former, but its instruction about the expert was both wrong and prejudicial. The Service also appeals the district court's award of back and front pay, but it forfeited that argument by failing to raise it below.

I.

Anthony Sansone began his thirty-year career at the Postal Service in 1981. He was diagnosed with multiple sclerosis in 1991, and, 8 years later, the disease put him in a wheelchair. The Service gave him a reserved space near the loading docks, where there was room to deploy his van's wheelchair ramp. That arrangement lasted until 2011, when the plant manager, Ruby Branch, asked Sansone to stop parking there.

Sansone was greatly upset by Branch's decision. He viewed it as arbitrary; Branch told him that it was driven by safety concerns. She offered Sansone two other options: to park in one of the handicapped spots in front of the building or her own reserved space in the back of the building. Neither met his needs. Branch's reserved space, like most of the handicapped spots, didn't provide enough room to deploy his van's passenger-side ramp, and the few handicapped spots that had enough room were usually taken. In addition, the spots in the back of the building (like Branch's spot)

would require him to travel in his wheelchair along a busy truck route in the dark. So with the permission of his direct supervisor, Chuck von Rhein, Sansone continued to park in his usual place while waiting for a solution to the problem.

Two weeks later, Sansone emailed the maintenance manager, LaShawn Jacobs, for an update on his parking situation. Jacobs reiterated what Branch had said before: that Sansone must park in one of the proposed spaces. Sansone then sought help from Stephen Grieser, chair of the Postal Service district's Reasonable Accommodation Committee, who told Sansone that he would start the process of identifying a reasonable accommodation for him.

A few days later, Branch noticed Sansone's van parked near the loading docks. She told Jacobs to inform Sansone that he should move it or risk having it towed. When Jacobs relayed the message, Sansone panicked, started to experience chest pain, and left work. He worried that if his van had been towed, he would have been stranded at work because he needed the van to load his wheelchair. The next day he went to see a doctor because he was still experiencing panic attacks. The doctor recommended that he stay home until the situation was rectified and prescribed medication to help him deal with the stress.

After another two weeks passed, Grieser sent Sansone a letter asking him to provide medical information about his "condition and the specific limitations that it imposes" so that he could address Sansone's parking situation. The letter exacerbated Sansone's frustration because in his view, it sought information that the Service already knew—that he had multiple sclerosis and was confined to a wheelchair. Sansone did not provide Grieser with the redundant medical

information. Instead, he asked von Rhein, his supervisor, to tell Grieser to stop pursuing the parking issue because by that point, the stress of the situation had rendered Sansone unable to go back to work at the Service no matter where he parked. He filed for disability retirement, which the Office of Personnel Management granted.

Sansone then sued the Service under the Rehabilitation Act, 29 U.S.C. § 791, *et seq.*, for constructive discharge and failure to accommodate. The district court granted the Service's summary judgment motion on the constructive discharge claim, but it denied both parties' motions for summary judgment on the failure to accommodate claim. The case proceeded to trial, and Sansone won $300,000 in compensatory damages.

After the verdict came in, the district court addressed Sansone's equitable claim for back and front pay. It awarded him $828,774—an amount covering the period between the date of his termination and January 20, 2023, the date on which he would have retired.

The Service presses three arguments on appeal, one related to the merits of Sansone's "failure to accommodate" claim and the other two related to damages.

## II.

To succeed on his failure to accommodate claim under 29 U.S.C. § 794, Sansone had to prove that (1) he was a qualified individual with a disability, (2) the Service was aware of his disability, and (3) the Service failed to reasonably accommodate his disability. *King v. City of Madison*, 550 F.3d

598, 600 (7th Cir. 2008).[1] Relevant to—and sometimes determinative of—the third element is the employer and employee's respective cooperation "in an interactive process to determine a reasonable accommodation." *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633 (7th Cir. 1998). The Service contends that the district court erroneously instructed the jury about the consequences of an employee's failure to cooperate in this "interactive process."

Some background on this "interactive process" is necessary to understand the Service's objection to the jury instruction. While the "interactive process" is important, it is a means for identifying a reasonable accommodation rather than an end in itself. *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1023 (7th Cir. 1997). And because the process is not an end in itself, an employer cannot be liable solely for refusing to take part in it. For example, "[f]ailure to engage in this 'interactive process' cannot give rise to a claim for relief … if the employer can show that no reasonable accommodation was possible." *Hansen v. Henderson*, 233 F.3d 521, 523 (7th Cir. 2000). Nor will it give rise to a claim against an employer who reasonably accommodated the employee. *Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000) ("The ADA seeks to ensure that qualified individuals are accommodated in the workplace, not to punish employers who, despite their failure to engage in an interactive process, have made reasonable accommodations."). But when a reasonable accommodation was possible and the employer did not offer it, the third

---

[1] "[T]o determine whether the Rehabilitation Act has been violated in the employment context, we refer to the provisions and standards of the [Americans with Disabilities Act]." *Jackson v. City of Chicago*, 414 F.3d 806, 810–11 (7th Cir. 2005); *see* 29 U.S.C. § 794(d).

element of a "failure to accommodate" claim turns on the "interactive process" requirement. *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005). In that event, "responsibility will lie with the party that caused the breakdown." *Id.* at 805. According to the Service, this is where the district court went awry.

The Service insists that the court erroneously instructed the jury that it could render a verdict for Sansone even if he was at fault for the breakdown of the interactive process. Over the Service's objection, the court instructed the jury as follows:

> Once an employer is aware of the employee's disability and an accommodation has been requested, the employer must discuss with the employee whether there is a reasonable accommodation that will permit him to perform his job. Both the employer and the employee must cooperate in the interactive process in good faith. Neither party can win this case solely because the other did not cooperate in that process in the way that the party believed appropriate, but you may consider whether a party cooperated in that process when deciding whether a reasonable accommodation existed.

The Service argues that telling the jury that "neither party can win this case solely because the other did not cooperate" is inconsistent with *Sears*, which says that "when an employer takes an active, good-faith role in the interactive process, it will not be liable if the employee refuses to participate or withholds essential information." 417 F.3d at 806.

The Service's argument distorts the jury instruction by focusing exclusively on the opening few words of a longer sentence. Read out of context, the cherry-picked words state that the jury cannot treat one party's failure to cooperate as outcome-determinative. That is inconsistent with *Sears*. Read in context, however, they make a different and entirely uncontroversial point: that the jury cannot evaluate the sufficiency of one party's cooperation according to the expectations of the other. ("Neither party can win solely because the other did not cooperate in that process *in the way that the party believed appropriate* … ." (emphasis added)). In other words, the Service's belief that Sansone did not cooperate did not mean that he did not cooperate—and vice versa. That is plainly correct.

In sum, the Service would have a point if the court had told the jury that Sansone could win even if he shut down the interactive process. Unfortunately for the Service, however, that is not what the court said.

III.

The Service's next argument concerns its expert witness, Dr. Diana Goldstein, who offered an opinion on the cause of Sansone's emotional distress, an issue relevant to compensatory damages. On cross-examination, Sansone's lawyer asked Goldstein if she had read the Service's brief in support of its summary judgment motion in the course of preparing her report. She said that she had, and Sansone's lawyer pressed: "To get your understanding of the facts you read the Postal Service's Statement of Material Facts in support of its motion for summary judgment, correct?" Goldstein replied:

> I wouldn't agree with that statement. I would
> say that it helps me understand the story, but I
> get my facts about what Mr. Sansone is claiming
> in turn—by way of emotional distress and
> changes in physical symptoms by meeting with
> him, by reviewing objective records, et cetera.
> But I do like to have context and so I always
> review the records just to get a sense of what the
> whole story is.

She added that as part of that context, she had also read Sansone's complaint, his answers to interrogatories, and his deposition. Sansone's lawyer asked whether she had read the brief opposing the Service's motion for summary judgment or the district court's decision denying the motion, and Goldstein said that she had not.

Shortly thereafter, Goldstein responded to a question about whether she had read the deposition of plant manager Ruby Branch by explaining that, although she had, she did not view it "as relevant to [her] role in assessing Mr. Sansone's emotional distress claim." The court interjected: "Wait just a minute. But you thought that the brief in support of a motion for summary judgment which was denied, that was relevant to your opinion?" When Goldstein answered, "I always read those," the court interrupted, "I am not asking what you always do. I am asking, in this case you felt that that is relevant to your rendition of an opinion, a lawyer's argument in connection with this case which was unsuccessful." Goldstein replied, "No. I just like to know what is going on with the case." The court later admonished counsel that giving Goldstein the summary judgment motion was a "flat-out violation of Federal Rule of Evidence 703."

The court hammered that position home in its jury instructions. In evaluating Goldstein's opinion, it told the jurors that they should keep in mind that

> [S]he had been provided by counsel for the Postal Service with a copy of the Postal Service's argument that had been made earlier in the case in support of an unsuccessful motion to prevent the case from going to trial on the premise that there were no genuine issues of material fact that called for consideration by a jury. That is a document that presents the Postal Service's version of the facts and of the legal arguments that they sought to support that motion. It was inappropriate for that information to be provided to the opinion witness. And that inappropriateness was amplified by the failure of the Postal Service's counsel to provide her with the successful argument that had been made by Sansone's lawyer in opposition to the motion and, more importantly, by the failure of Postal Service's counsel to provide her with the Court's opinion that rejected the motion.

> It should be added, though, that Sansone's counsel is also at fault. Why? For not having raised the matter before this Court well in advance of trial because the teaching of the Supreme Court is that the trial judge serves as what they call the gatekeeper in ruling on whether it is or is not proper for any specific proposed opinion witness to be allowed to present his or her testimony to a fact-finding

> jury for its consideration. And that matter came before you, just as it came before me, solely at the end of the case.

> Now with all of that said, you may consider what has been set forth in this instruction that I have composed in explaining the determination called for in the first paragraph of the instruction, that is, give the testimony of each of the witnesses whatever weight you think it deserves, considering the reasons for the opinion, the witness' qualifications and all of the other evidence in the case.

The Service contends that this instruction erroneously invited the jury to disregard Goldstein's opinion.

The Service is right. Contrary to the court's belief, the Service did not commit a "flat-out violation of Federal Rule of Evidence 703" by giving Goldstein its summary judgment motion. Rule 703 does not govern the information that experts can have; it governs the information on which they can base their opinions. It allows experts to rely on inadmissible facts or data in forming an opinion so long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." FED. R. EVID. 703.

If Goldstein had relied on the summary judgment motion in forming her opinion, the court would have had to determine whether experts in her field "reasonably rely" on summary judgment motions in assessing someone's emotional distress—and presumably they don't. But Goldstein expressly stated that she did *not* rely on the

summary judgment motion in forming her opinion. She read the summary judgment motion—along with Sansone's complaint and answers to interrogatories—solely to get context about the case. She based her opinion on the facts that she got from Sansone and his medical records. So long as those are the kinds of facts and data on which experts in her field reasonably rely—and presumably they are—her opinion satisfied Rule 703. Any suggestion that Goldstein was biased in favor of the Service could be explored on cross—as Sansone was doing before the court seized sua sponte on the illusory Rule 703 issue.

The district court thus erred when it told the jury that the Service had acted inappropriately by giving Goldstein the summary judgment motion and suggesting that it would have excluded her testimony had it learned about the issue earlier. Even so, "a new trial is required only if the flawed instruction could have confused or misled the jury causing prejudice to the complaining party." *Doornbos v. City of Chicago*, 868 F.3d 572, 580 (7th Cir. 2017). Sansone says that the Service was not prejudiced because Goldstein testified that she didn't rely on the summary judgment motion, the court permitted the jury to consider her testimony, and the instruction emphasized that Sansone was also to blame for not raising the issue earlier.

None of those things blunted the effect of the district court's erroneous instruction, which all but told the jury that it shouldn't trust anything that Goldstein had said. This not only misled the jury but also invaded the jury's function in assessing witness credibility. *See Stollings v. Ryobi Tech., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) (explaining that although the district court serves as gatekeeper, "[t]he jury must still be

allowed to play its essential role as the arbiter of the weight and credibility of expert testimony"). At the very least, the instruction left the jury unsure what to make of Goldstein's testimony. *See Rapold v. Baxter Int'l Inc.*, 718 F.3d 602, 609 (7th Cir. 2013) (explaining that a party is prejudiced by jury instructions when the "jury was likely to be misled or confused" by them); *Miller v. Neathery*, 52 F.3d 634, 639 (7th Cir. 1995) ("Under these circumstances, it would be imprudent for us to determine that the lack of sufficient guidance in the instructions did not contribute significantly to the jury's conclusion.").

The prejudice was particularly acute given what had happened earlier in the trial. *See Susan Wakeen Doll Co., Inc. v. Ashton-Drake Galleries*, 272 F.3d 441, 452 (7th Cir. 2001) ("An erroneous jury instruction could not prejudice [a party] unless considering the instructions as a whole, along with all of the evidence and arguments, the jury was misinformed about the applicable law."). The court interrupted the cross-examination of Goldstein to admonish her, expressing incredulity that she had read the summary judgment motion. *See United States v. El-Bey*, 873 F.3d 1015, 1022 (7th Cir. 2017) (explaining that a trial judge has great influence on the jury and that any statement made about a witness carries great weight). The instructions therefore invited the jury to act on the skepticism that the court had already sowed.

In short, the instruction was erroneous and prejudicial. But because Goldstein's testimony went solely to compensatory damages, we remand for a new trial on that issue only. *See MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081, 1166 (7th Cir. 1983).

IV.

The Service's final argument is that the court erred by awarding Sansone equitable relief in the form of back and front pay for the time after he retired. It contends that constructive discharge is required for equitable relief; because Sansone was never actively or constructively discharged, it says, he does not qualify.

Sansone argues that the Service waived this argument by failing to raise it below. What he means to say, however, is that the Service *forfeited* this argument. *See Hamer v. Neighborhood Hous. Servs. of Chicago*, 138 S. Ct. 13, 17 n.1 (2017) ("The terms waiver and forfeiture—although often used interchangeably by jurists and litigants—are not synonymous."). Waiver is intentionally abandoning a known right. *United States v. Seals*, 813 F.3d 1038, 1044–45 (7th Cir. 2016). Forfeiture occurs when a party fails to make an argument because of accident or neglect. *Id.* at 1045. That's what Sansone says that the Service did here.

The Service insists that it raised this argument—that Sansone failed to prove actual or constructive discharge and thus could not receive back or front pay—in its damages brief to the district court. This is wishful thinking. The damages brief focused on two things: (1) errors that the court made based on the evidence at trial and (2) why Sansone's award should be offset by his retirement benefits. And the sole legal citation in the entire brief went to the offset issue. Indeed, only *one* sentence in the analysis section of its brief mentioned that Sansone chose to retire. Read in isolation, that reference might gesture toward a lack of actual or constructive discharge—but the rest of that sentence continued the brief's focus on offsetting damages with Sansone's retirement benefits. The

very best we can say—and it is a stretch—is that the Service raised the "general issue" in its damages brief. Avoiding forfeiture requires more. *See Domka v. Portage Cty., Wis.*, 523 F.3d 776, 783 n.11 (7th Cir. 2008) (stating that a party cannot raise an issue for the first time on appeal when it raised only the "general issue" below).

* * *

We VACATE the judgment and REMAND for a new trial on the damages issue. We AFFIRM it with respect to the Service's liability, the award of back and front pay, and the award of attorneys' fees and expenses.[2]

---

[2] Because we affirm the judgment as to the Service's liability, Sansone remains entitled to attorneys' fees and expenses. *See* 29 U.S.C. § 794a; 42 U.S.C. § 2000e-5(k); *cf. Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598, 603 (2001) ("In designating those parties eligible for an award of litigation costs, Congress employed the term 'prevailing party,' a legal term of art. Black's Law Dictionary 1145 (7th ed. 1999) defines 'prevailing party' as '[a] party in whose favor a judgment is rendered, regardless of the amount of damages awarded.'" (alteration in original))