In the

# United States Court of Appeals

### For the Seventh Circuit

No. 15-2976

EYMARDE LAWLER,

*Plaintiff-Appellant,*

*v.*

PEORIA SCHOOL DISTRICT NO. 150,
An Illinois Local Governmental Entity,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 12-1299 — **James E. Shadid**, *Chief Judge.*

ARGUED JULY 7, 2016 — DECIDED SEPTEMBER 16, 2016

Before WOOD, *Chief Judge,* and BAUER and KANNE, *Circuit Judges*.

PER CURIAM. Eymarde Lawler was diagnosed with post-traumatic stress disorder ("PTSD") at least five years before School District 150 in Peoria, Illinois, hired her to teach students with learning disabilities. For the next nine years Lawler performed that job satisfactorily and was given tenure, and not until 2010, when her psychiatrist concluded that

Lawler had suffered a relapse of her PTSD, did District 150 learn about her impairment. After that Lawler was transferred to a different school to teach children with not only learning disabilities but also severe emotional and behavioral disorders. Both Lawler and her supervisor at the new school thought she was ill-prepared for this new role, but District 150 did not relent. After a year in the new position, Lawler was rated as "satisfactory," but then at the start of her second year she was injured by a disruptive student, sending her to the hospital with a concussion and neck injury. Her psychiatrist notified District 150 that this episode and other recent incidents had "retriggered" Lawler's PTSD and that she needed to be transferred to a different teaching environment. District 150 did not transfer Lawler but instead accelerated her next performance appraisal, rated her as unsatisfactory, and fired her as part of an announced reduction in force that ended with all but "unsatisfactory" teachers being rehired. Lawler then filed this action under the Rehabilitation Act of 1973, *see* 29 U.S.C. § 794, claiming that District 150 not only failed to accommodate her PTSD but also fired her in retaliation for requesting an accommodation. The district court granted summary judgment for the school district, and in this appeal the principal issue is whether a jury reasonably could find, as Lawler says, that the school district failed to accommodate her PTSD. We conclude that a jury could find for Lawler, and thus we vacate the judgment and remand the case for trial.

### Background

Except as noted, the parties agree about the material evidence, which we view in the light most favorable to Lawler,

the opponent of summary judgment. *See E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

Dr. Steven Hamon, a clinical psychologist, began treating Lawler in 1994. He diagnosed complex PTSD with accompanying symptoms of dissociation and depression. After five years of treatment, Lawler was hired by District 150 to teach special education classes part time but eventually obtained full-time employment and then tenure. She received annual performance reviews, which included satisfactory ratings from 2006 through 2011. As of 2011, Lawler's PTSD was still in remission.

The school district first found out about Lawler's PTSD during the 2009–2010 school year, after Lawler's relationship with the principal of her school had deteriorated and she asked to take a leave of absence. Dr. Hamon wrote a letter to Human Resources recommending that Lawler be given a temporary leave of absence followed by a transfer to a different school. Hamon explained that the "conflictual situation" between Lawler, the principal, and other teachers was affecting Lawler's mental health. Lawler's request for a leave of absence was granted in May 2010, and she did not return to work until the beginning of the 2010–2011 school year.

That fall Lawler was reassigned to the Day Treatment program at Trewyn School. That program is for children with learning disabilities as well as severe behavioral and emotional disorders. Lawler, who had not been consulted about this assignment, was nervous about her qualifications. Although she was trained to educate students with learning disabilities, she did not have any experience working with students suffering from severe behavioral problems. Before the school year began, Lawler communicated her apprehen-

sion to her new supervisor at Trewyn Day Treatment, Mary Camp, who shared her concerns and contacted Human Resources about Lawler's lack of experience. In response District 150 told Lawler that she had no choice about the Trewyn placement. Lawler made the best of this inflexibility, and by the end of her first year, she had earned a "satisfactory" rating from Camp, who even noted areas of improvement. Camp wrote that Lawler had "been developing interpersonal skills that have been [cited] as weaknesses in the past." She noted that Lawler had made improvements in managing the classroom, actively engaging students, and using nonverbal means of correcting behavioral problems. She added that Lawler needed to continue improving in these areas.

Lawler was assigned to the same position for 2011–2012, but that school year proved to be a difficult one for her. During the summer her father had passed away unexpectedly, leaving Lawler and her siblings to cope with caring for their disabled mother. And just before school started, Lawler had been at an ice cream shop when a woman pulled up in an SUV and began screaming that her friends had been shot; Lawler went to the SUV to help, saw a man with severe gunshot wounds, and called 911. Then on September 16, a male student in Lawler's class broke away from a police officer and collided with Lawler, causing her to hit her head against a wall and suffer a concussion. She was taken to the hospital, where she was treated for neck spasms. Her family physician, Dr. Henry Gross, followed up and treated Lawler for neck pain and stiffness as well as headaches. After this incident Dr. Hamon, the psychologist, notified Human Resources that the year's events had "retriggered" Lawler's PTSD. He opined that Lawler needed, and requested on her

behalf, a two-week leave of absence and then a transfer to a classroom having fewer students with behavioral and emotional disorders.

Teri Dunn, the Director of Human Resources, received Dr. Hamon's letter on September 21, 2011, and met with Lawler the same day. Lawler was given a two-week medical leave of absence but not a transfer, and she and Dunn disagree about when and why the decision was made to refuse a transfer. According to Lawler's deposition testimony, Dunn told her *during* this meeting that she would not be given a transfer and asked her to complete paperwork relevant only to the medical leave of absence. In contrast, at her deposition Dunn said that she recalls telling Lawler that additional information was needed to process her transfer request and included the necessary forms in a packet of paperwork provided during the meeting. Dunn insisted that only later did she deny the transfer request, and that was because she never received the completed paperwork.

Lawler's leave of absence started immediately after the meeting with Dunn. Two days later, Lawler sent Dunn an e-mail stating in part: "I am confident that if I return to Day Treatment I'll be able to do the job I've been hired to do. I realize that my request for a transfer is not a guarantee." Lawler then met with Dr. Hamon, who wrote Human Resources saying that "Lawler may return to work" on October 5, 2011. This letter from the psychologist did not list any work restrictions or allude to his earlier opinion that Lawler should be transferred.

The day she returned to work in October 2011, Lawler used the school's photocopier to duplicate a letter from Dr. Gross, the family physician, stating that "due to injury at

work" Lawler "can no longer participate" in the Day Treatment program. Gross wrote that Lawler should be removed from that program for children with severe behavioral and emotional disabilities and transferred to an environment comparable to where she had worked previously. Lawler inadvertently left the doctor's note on the copier, where it was found by Mary Camp. After reading it Camp sent Lawler home with instructions to contact Human Resources. That same day, by Lawler's account, she met with Teri Dunn and explained that, although she realized Dunn had denied her transfer, she procured the letter to give to her union because she still wanted a different teaching placement. During discovery Dunn denied any recollection of this meeting.

Dr. Gross's letter would become significant the following February when Lawler received her next (and, as it turned out, last) performance evaluation. In that evaluation, Carolyn Nunn, who replaced Mary Camp as Lawler's supervisor in October, says that Lawler eventually confessed to her that a friend, not Dr. Gross, had written the letter so that she could be transferred away from Camp. Nunn repeated that accusation in her deposition, but Lawler says it's a lie. There is no evidence that the letter is a fake, and the copy produced during discovery appears to have been faxed directly from Dr. Gross's medical office.

Nunn's evaluation of Lawler also describes purported problems with unnecessarily abrasive communications, inappropriate interruptions of classes, inappropriate interactions with other employees and students, and inappropriate handling of confidential matters. Nunn says in the evaluation, for example, that on one occasion Lawler "needlessly interrupted instruction" to retrieve a document that she felt

was missing from the computer lab's binder of student sign-in sheets. Another time, according to the evaluation, Lawler interrupted a teacher who was collecting student breakfast orders to get the teacher's write-up about a student who had reported feeling unsafe with his father (an incident that occurred two months previously). According to the evaluation, Lawler had "upset the teacher for the rest of the day" by interrupting the breakfast preparations and made her "unable to complete her responsibilities clearly." Yet another example Nunn gives of Lawler's "inappropriate interactions with other employees" is an incident in which Lawler dispatched another teacher to the office to get assistance in dealing with unruly students after she apparently had told a teaching assistant, who was having an asthma attack, to seek help from another TA. The students, Nunn says in the evaluation, "perceived this as disrespect for the aide and started yelling at Mrs. Lawler and throwing objects." The students' unruliness "could have been avoided," the evaluation continues, "if Ms. Lawler had shown compassion for the aide's medical condition." As an example of Lawler not "handling confidential matters tactfully," Nunn describes a situation when a security officer found marijuana in a student's desk and, before the officer could notify Nunn, Lawler had "walked from one end of the building to the other" to find Nunn and tell her "which student's desk and who was thought to be the rightful owner."

Ultimately, Nunn rated Lawler's performance as "unsatisfactory" in that February 2012 evaluation. This was the first unsatisfactory rating that Lawler had received in her 14 years with District 150. Other evaluations (typically completed in April or May of each year) had remarked generally that Lawler "would benefit from handling confidential in-

formation and difficult situations with her students and colleagues more tactfully in accordance with district policies and practices." One review, written by Lawler's supervisor right before Lawler's transfer to the Day Treatment program at Trewyn, noted that Lawler's "greatest obstacle" was "working cooperatively with colleagues" and stated that she had created "so much unnecessary drama" that "no one else wanted to work with her." Despite these critical comments, however, Lawler always had received "satisfactory" ratings.

Lawler also received two disciplinary write-ups during the 2011–2012 school year. In December 2011, after Lawler had asked to be transferred out of the Day Treatment program at Trewyn, District 150 suspended her for three days on account of an incident that had occurred in September, before she was injured by the unruly student. Lawler was required under 320 ILCS 20/4(a-5) to report suspected child abuse to the Illinois Department of Child and Family Services. Lawler had overheard a student telling another that his father was abusing him, and Lawler immediately reported the conversation to Camp, who was still her supervisor. District 150 does not dispute that Camp told Lawler she need not report the incident to DCFS because the student was a "liar." Nevertheless, after Nunn had replaced Camp as her supervisor, Lawler also reported the incident to her. Nunn countermanded Camp and told Lawler to call DCFS and make a report, which Lawler did. Lawler also was disciplined in February 2012, two days after the unsatisfactory performance evaluation, because she had "dumped" a disruptive student out of his desk and used improper restraint techniques.

A couple of weeks after receiving her performance evaluation, Lawler submitted to Human Resources another letter from Dr. Hamon recommending a leave of absence for the remainder of the school year and then reassignment to a different classroom at the start of the new school year. The school district approved a leave of absence through the end of March 2012 but asked Lawler for additional medical documentation before deciding whether to extend that leave through the end of the year. Lawler provided more documentation from Dr. Hamon and a psychiatrist, Dr. Arun Pinto, substantiating the need for extended leave because of her mental health.

District 150 agreed to extend Lawler's leave through the end of the school year, but she was not reassigned to a different classroom for the 2012–2013 school year. Instead, District 150 notified Lawler in April 2012 that she and 57 other teachers were being "honorably" discharged as part of a reduction in force. The unsatisfactory evaluation had placed Lawler in "Group 2" of teachers—by statute, the first group to be discharged during a RIF after those teachers who were recently hired or only part-time. 105 ILCS 5/24-12(b). Although the position that Lawler had held at Trewyn School became available again in the fall after District 150 concluded that its finances were adequate to reverse the RIF and fill all vacated teaching jobs, Lawler was not rehired. She sued the school district in state court claiming that it had violated the Illinois School Code by not rehiring her, but the state courts concluded that teachers in Group 2 do not have recall rights under the School Code. *See Frakes v. Peoria Sch. Dist. No. 150*, 12 N.E.3d 217 (Ill. App. Ct. 2014).

A couple of weeks before filing that lawsuit, Lawler
brought this one in federal court under the Rehabilitation
Act, claiming that District 150 had failed to accommodate
her PTSD and also had retaliated with the unsatisfactory
evaluation because she had asked for an accommodation. In
granting summary judgment for District 150 on both claims,
the district court reasoned that the school district had suffi-
ciently engaged in an interactive process to accommodate
Lawler's PTSD by permitting a two-week medical leave of
absence. The court thought that Lawler's e-mail saying that
she could return to work and Dr. Hamon's letter approving
her return were "fatal" to her assertion that the accommoda-
tion was insufficient. And the retaliation claim also failed
because Lawler, according to the court, had not demonstrat-
ed a causal connection between her expressed need for an
accommodation and the unsatisfactory performance evalua-
tion.

**Analysis**

As an initial matter, District 150 argues that the final
judgment in Lawler's state-court lawsuit precludes her fed-
eral claims under the doctrine of res judicata. We disagree.
Even assuming that Lawler could have joined her Rehabilita-
tion Act claims with her claim in state court under the
School Code, *see Walczak v. Chicago Bd. of Educ.*, 739 F.3d
1013, 1016–17 (7th Cir. 2014), we conclude that District 150
acquiesced to "claim-splitting." Federal courts must give a
state judgment the same preclusive effect that it would have
in state court, *see Migra v. Warren City Sch. Dist. Bd. of Educ.*,
465 U.S. 75, 81 (1984); *Walczak*, 739 F.3d at 1016, and one as-
pect of Illinois's preclusion doctrine is the rule against "split-
ting" a claim between separate lawsuits, which prohibits a

plaintiff from suing for part of a claim in one action and then suing for the remainder in another action. *See Brown v. City of Chicago*, 771 F.3d 413, 414–15 (7th Cir. 2014); *Rein v. David A. Noyes & Co.*, 665 N.E.2d 1199, 1206–07 (1996). An exception exists, however, if the defendant acquiesces to claim-splitting, which may occur by not timely objecting. *See Rein*, 665 N.E.2d at 1207; *see also Piagentini v. Ford Motor Co.*, 852 N.E.2d 356, 363 (Ill. App. Ct. 2006) (concluding that defendant had acquiesced to claim-splitting by participating in discovery and waiting 3½ years before moving to dismiss second lawsuit on ground of res judicata), *vacated on unrelated ground*, 886 N.E.2d 1025 (Ill. 2008); *Thorleif Larsen & Son, Inc. v. PPG Indus., Inc.*, 532 N.E.2d 423, 427 (Ill. App. Ct. 1988) (concluding that defendant acquiesced to claim-splitting by not objecting to maintenance of separate suits); RESTATEMENT (SECOND) OF JUDGMENTS § 26, cmt. a, at 235 ("The failure of the defendant to object to the splitting of the plaintiff's claim is effective as an acquiescence in the splitting of the claim."). Even though Lawler filed her state-court complaint within weeks of filing her federal suit, District 150 waited more than 18 months to raise res judicata as a potential affirmative defense in the federal case. District 150 hasn't given any reason for this delay, nor has it explained why its prolonged inaction should not be treated as acquiescence. What is more, even if we did not interpret District 150's conduct as acquiescence, the only claim that could plausibly have been barred by the rule against claim-splitting would be Lawler's contention that, after she had sought an accommodation, District 150 retaliated by giving her the negative performance evaluation that prevented her rehire when the school district reversed its RIF. Lawler's claim that District 150 failed to accommodate her need for a transfer in September

2011, long before the RIF was announced, has little, if any, overlap with Lawler's state-court case, which dealt only with whether she was improperly dismissed and whether the School Code obligated the school district to hire her back when the RIF was deemed unnecessary.

So neither of Lawler's claims was precluded, but in this court she does not discuss—and thus has abandoned—her claim of retaliation. Thus, we consider only her claim that District 150 failed to accommodate her disability. On that claim Lawler argues that the district court erred in granting summary judgment to District 150 because, she asserts, the record includes a material dispute about whether Teri Dunn, the Director of Human Resources, worked with her to accommodate her PTSD. Lawler insists that, during their very first meeting on September 21, 2011, Dunn summarily refused to consider transferring her out of the Day Treatment program at Trewyn. And this action, Lawler contends, constituted a refusal to engage in the interactive process required by statute. Moreover, Lawler continues, if the school district interpreted her follow-up e-mail or Dr. Hamon's follow-up letter to mean that she no longer sought an accommodation, someone should have asked for clarification. But, Lawler concludes, no one at District 150 followed up until she renewed her request for a transfer later that spring, after her allegedly declining performance already had earned her the negative performance evaluation.

Under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101–12213 (and thus, the Rehabilitation Act, *see Ozlowski v. Henderson*, 237 F.3d 837, 839 (7th Cir. 2001)), both the employer and employee are responsible for engaging in an "interactive process" to find a reasonable accom-

modation for the employee's disability. *See* 29 C.F.R. §1630.2(o)(3); *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014); *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). Both parties are required to make a "good faith effort" to determine what accommodations are necessary, but if a breakdown of the process occurs, "courts should attempt to isolate the cause … and then assign responsibility." *Beck*, 75 F.3d at 1135.

According to Lawler's version of events (which, because this case was decided at summary judgment, must be credited), the school district's response to her expressed need for a transfer amounted to a refusal to engage in the interactive process. The Director of Human Resources summarily refused to authorize a transfer after reading Dr. Hamon's letter in which he opined that Lawler should "transfer to another special education job in the District that does not involve [behavioral and emotional disorder] students." The Director's outright refusal belies any contention that District 150 made a reasonable attempt to explore possible accommodations, such as looking for open positions in other schools or reducing the number of students with behavioral or emotional disorders in Lawler's classroom. *See Miller v. Ill. Dep't of Corr.*, 107 F.3d 483, 486 (7th Cir. 1997) (explaining that employer must "make a reasonable effort to explore the possibilities" after learning of employee's request for accommodation). The school district simply sat on its hands instead of following-up with Lawler or asking for more information. *See E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 803–04 (7th Cir. 2005) ("[A]n employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance, or by intentionally remaining in the dark."). If the school district had inquired about its long-

term employee, it would have learned that many of the interpersonal issues cited by Lawler's supervisors as performance problems likely were caused by her PTSD. As Dr. Hamon later testified during discovery, Lawler often resorted to interpersonal coping methods like trying to help others or offering them information in order to get close to them when she felt stressed, frightened, or anxious. These behaviors, he explained, signaled her feelings of uncertainty around authority figures, but often were misinterpreted as Lawler being "nosy" and elicited negative feedback from colleagues.

District 150 contends that it reasonably accommodated Lawler's PTSD by granting her request for a 2-week medical leave of absence. That contention is frivolous. This short-term leave after Lawler's on-the-job injury and hospital visit did not address her psychologist's concern that Lawler's PTSD was aggravated by working with the students having severe behavioral and emotional disorders. A few weeks respite from that environment might have given Lawler some relief while she was away, but according to her psychologist, returning to the same position would impede her ability to control her PTSD. An employee is not entitled to the accommodation of her choice, *see Swanson v. Vill. of Flossmoor*, 794 F.3d 820, 827 (7th Cir. 2015); *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1178 (7th Cir. 2013), but if Lawler's job performance really did decline after she returned to the same position despite wanting a transfer, then the school district surely was on notice that more than a two-week break was needed to give Lawler an opportunity to continue working with PTSD (as she had been doing for years before the school district learned of her impairment). *See Bultemeyer v. Fort Wayne Comm. Schs.*, 100 F.3d 1281, 1285–86 (7th Cir.

1996). And a jury could find from the evidence that Lawler's need for a transfer easily could have been accommodated, since at least seven openings for special education teachers existed in other schools within District 150 at that time. *See* 42 U.S.C. § 12111(9)(B) (listing reassignment to vacant position as example of reasonable accommodation); *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998) (ADA may require employer to reassign employee to vacant position if available). What was not an option, however, was for the school district to look the other way until Lawler could be fired for poor performance.

Somewhat antithetical to District 150's argument that it did accommodate Lawler is it's contention that it was not required to consider Lawler's request for a transfer because Lawler never completed the necessary paperwork allegedly given to her by Dunn at their meeting on September 21, 2011. But this response suffers from two fatal flaws. For one, it would require that we view the evidence in the light most favorable to the school district rather than Lawler, who testified at her deposition that Dunn turned her down *at* their first meeting, not later. And Lawler's testimony highlights the second flaw: The packet of information supposedly given to Lawler—an exhibit produced during discovery by the school district, not Lawler—relates only to medical leave under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601–2654, not the Rehabilitation Act or the ADA. And neither is there anything in that packet about the steps to request an accommodation.

Moreover, even if District 150 did think that Lawler had changed her mind about the need for an accommodation during her two weeks of medical leave, the school district

failed to engage in the interactive process by making that assumption without seeking clarification from Lawler or Dr. Hamon. *See Spurling*, 739 F.3d at 1061–62 (explaining that employer has not engaged in interactive process if it has not sought clarification from employee or doctor when in doubt about employee's continuing desire for accommodation). Dunn said during her deposition that she interpreted Lawler's e-mail expressing confidence about returning to work as a representation that she could continue performing her job with the Day Treatment program and no longer sought a transfer. Dunn similarly testified that she interpreted Dr. Hamon's note approving Lawler's return to work without mentioning a transfer or other restrictions as indicating that Lawler no longer needed an accommodation. But Lawler continued to insist on transferring, and the letter from Dr. Gross found its way into the hands of both Lawler's direct supervisor and Dunn, the Director of Human Resources, after the school district's receipt of Lawler's e-mail and Dr. Hamon's work release, so even If Lawler had not formally submitted the physician's letter to them, they were on notice that Lawler still wanted her PTSD accommodated by a classroom transfer. *See Miller*, 107 F.3d at 486–87 (explaining that employer on notice that employee suffers disability must make reasonable effort to understand what employee's needs are even if not clearly communicated to employer); *Bultemeyer*, 100 F.3d at 1285 (same). A jury reasonably could conclude that District 150's failure to seek clarification from Lawler or her doctors caused the breakdown in the interactive process.

Accordingly, we VACATE the district court's judgment, and REMAND for further proceedings.