In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 19-2780

MARK MLSNA,

*Plaintiff-Appellant*,

*v.*

UNION PACIFIC RAILROAD COMPANY,

*Defendant-Appellee*.

_____

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 18-cv-37-wmc — **William M. Conley**, *Judge*.

_____

ARGUED MAY 27, 2020 — DECIDED SEPTEMBER 14, 2020

_____

Before EASTERBROOK, HAMILTON, and BRENNAN, *Circuit
Judges*.

BRENNAN, *Circuit Judge*. When the Federal Railroad Administration put in place new regulations related to hearing, a train conductor—who has been hearing-impaired since youth and has worn hearing aids for years—was caught in a bind. He passed a hearing acuity test, but only when using hearing aids without additional hearing protection.

According to the railroad, this placed him in violation of a policy which requires that protection be worn if the employee is exposed to noise above a certain level. The railroad and the conductor could not agree on an accommodation for him to use other hearing devices. The railroad would not recertify the conductor, and he lost his job.

The conductor sued arguing that the railroad discriminated against him because of his hearing disability. The district court granted summary judgment to the railroad, finding that the conductor "failed to marshal enough evidence for a reasonable jury to conclude that he could fulfill the essential functions of the train conductor position with a reasonable accommodation." We view the record differently. Issues of fact exist as to whether wearing hearing protection is an essential function of the plaintiff's work as a conductor, as well as whether reasonable accommodations for the conductor were properly considered. So we reverse and remand for further proceedings.

# I

## A. Factual Background

Mark Mlsna has experienced hearing loss since youth. Although the precise cause is not known, at an early age he was exposed to loud farming equipment. He began working as a train conductor in the late 1990's, and in 2006 he was hired by Union Pacific. At that time, Mlsna had worn hearing aids for more than 10 years. Union Pacific was aware of Mlsna's hearing impairment when he was hired.

In 2012 the Federal Railroad Administration implemented regulations to ensure that train conductors possessed hearing acuity, and to confirm that railroads appropriately protected

and conserved their employees' hearing. A grandfather clause granted thirty-six months after which Union Pacific required all conductors to comply with the hearing acuity regulation. 49 C.F.R. § 242.105(c). In February 2015 Union Pacific had Mlsna's hearing tested a number of different ways: with hearing aids and without, using an amplified hearing protection device[1] called the "Pro Ears–Gold" with the sound turned off, and using that device with the sound turned on.

Without his hearing aids and without hearing protection, Mlsna did not pass the hearing acuity test. The results showed that he "had an average loss of 65 decibels" in his better ear. Mlsna also did not pass the audiological test using the Pro Ears–Gold. Rather, he passed only when he relied on his hearing aids with no additional hearing protection. Later Mlsna was retested with the same results: he passed, but only while wearing hearing aids without hearing protection.

After receiving the test results, Union Pacific decided it could not recertify Mlsna to work as a conductor. When he wore hearing aids and passed the hearing acuity requirement he was in violation of Union Pacific's hearing conservation policy, which required additional hearing protection. And when he complied with that policy by wearing the Pro Ears–Gold, he could not pass the hearing acuity test.

To address this problem, Mlsna proposed he use a custom-made hearing protection called the E.A.R. Primo. But Union Pacific rejected his proposal because that device did not have a factory-issued or laboratory-tested noise reduction rating, as required by 49 C.F.R. Pt. 227 App. B. Union Pacific never

---

[1] Such a device simultaneously amplifies safe noise and blocks harmful and excessive noise.

identified an alternative to the device it had suggested, the Pro Ears–Gold. Union Pacific declined to recertify Mlsna as a conductor and his employment was terminated.

### B. Federal Railroad Administration regulations

To elucidate the parties' dispute and their arguments, more detail is necessary on the 2012 revisions to the Federal Railroad Administration regulations. Under the hearing acuity regulation, 49 C.F.R. § 242.117(i), all railroads must test the hearing of their conductors. Each conductor must pass a hearing test showing he or she "does not have an average hearing loss in the better ear greater than 40 decibels with or without the use of a hearing aid." *Id*.

Under the hearing protection regulation, 49 C.F.R. § 227.115, railroads must establish a hearing conservation policy with programs to protect the hearing of vulnerable employees. Subsection (d) of that regulation sets the default rule, requiring employees wear hearing protection if they are exposed to a time-weighted average of 90 decibels or higher. Subsection (c), with an 85-decibel standard, applies only if no audio test has been performed on an employee, or if that employee has experienced hearing loss while employed with the railroad.

The hearing protection regulation sets a floor, not a ceiling. 49 C.F.R. § 227.1 ("This part prescribes minimum Federal health and safety noise standards for locomotive cab occupants. This part does not restrict a railroad … from adopting and enforcing additional or more stringent requirements."). Union Pacific set a stricter standard in its hearing conservation policy. All of its employees must wear hearing protection if they "may be subjected to noise exposures equal to or

exceeding an 8-hour time weighted average sound level of 85 decibels" or if they work "in identified hearing protection areas" or within 150 feet of a locomotive. The railroad also required all employees subject to its policy to wear a device with a published noise reduction rating.

To measure decibel levels, railroads are required to conduct either "area sampling," which takes several noise measurements at different locations within a workplace, or "representative personal sampling," which measures the exposures of employees who operate similar equipment under similar conditions. 49 C.F.R. § 227.103(b). The latter, which Union Pacific employed, must be used where there are "circumstances such as high worker mobility, significant variations in sound level, or a significant component of impulse noise." *Id*.

If the hearing protection regulation (§ 227.115(c) or (d)) applies, the employer "must select one of … three methods by which to estimate the adequacy of hearing protector attenuation." 49 C.F.R. Pt. 227 App. B. One of these methods requires the employee to wear a device with a published noise reduction rating, which is a unit of measure to assess the effectiveness of hearing protection devices to decrease sound exposure within a working environment.

### C. Procedural Background

Back to this case: Mlsna sued Union Pacific, claiming the railroad terminated him because of his hearing impairment and so violated the Americans with Disability Act. 42 U.S.C. § 12101 *et seq.* Although Mlsna's complaint characterized his sole claim as for disparate treatment, that claim also contained elements of a reasonable accommodation claim.

A disparate treatment claim arises from ADA language prohibiting covered entities from "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee." 42 U.S.C. § 12112(b)(1). To prevail on a disparate treatment claim, a plaintiff must show (1) he was disabled, (2) he was qualified to perform essential functions with or without reasonable accommodation, and (3) his disability was the "but for" cause of the adverse employment action. *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019).

A failure-to-accommodate claim is grounded in ADA language defining discrimination in part as "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual." 42 U.S.C. § 12112(b)(5)(A). To succeed on a reasonable accommodation claim, a plaintiff must show  (1) he was disabled, (2) his employer was aware of his disability, and (3) he was a qualified individual who, with or without reasonable accommodation, could perform the essential functions of the employment position. *Basith v. Cook Cty.*, 241 F.3d 919, 927 (7th Cir. 2001).

Whether Mlsna's complaint is read as claiming disparate treatment, as seeking a reasonable accommodation, or both, these claims share the element that the plaintiff be able to perform the essential functions of the job with or without reasonable accommodations. On that element, the district court granted summary judgment to Union Pacific, concluding that Mlsna failed to present evidence for a reasonable jury to find that he could fulfill the essential functions of the train conductor position with a reasonable accommodation.

In considering whether Mlsna was a qualified individual able to perform essential functions, the district court ruled

that no jury could conclude that the railroad acted unreasonably in making the use of hearing protection an essential function of the conductor position. The court also decided that no reasonable accommodation existed for Mlsna. While Mlsna offered the E.A.R. Primo as an accommodation, the court decided that he had not presented evidence from which a reasonable jury could conclude that Union Pacific's stated reason—the lack of a noise reduction rating—was pretext, or that the E.A.R. Primo would permit him to fulfill the essential functions of a conductor. So the district court found that the railroad's rejection of the E.A.R. Primo was reasonable.[2]

Mlsna appeals. We "review summary judgment de novo, and will affirm when—viewing the evidence in the light most favorable to the nonmovant and drawing all reasonable inferences in its favor—there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Scheidler*, 914 F.3d at 540.

## II

The parties do not dispute that Mlsna had the requisite background, experience, and knowledge to work as a train conductor. They also agree that his hearing impairment is a qualifying disability under the ADA, and that his disability was the reason he was not recertified to continue as a conductor. In dispute is whether Mlsna can perform the essential functions of the position of train conductor with or without reasonable accommodation.

---

[2] Mlsna moved to reconsider these rulings, which the district court denied.

### A. Essential Functions

When deciding whether a qualified individual is able to perform essential functions, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description … , this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Federal labor regulations define "essential functions" generally as "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n). Those regulations give reasons why a function may be essential and list the types of evidence which may be considered to determine if a function is essential. *Id*.

The district court agreed with Union Pacific that wearing hearing protection is an essential function of the train conductor position. In so concluding, the court considered various pieces of evidence:

- the job description of conductor

- the requirement to use hearing protection if exposed to an eight-hour time weighted average of 90 decibels or more in 49 C.F.R. § 227.115(d);

- Union Pacific's representative sampling data, which the court said revealed a reasonable likelihood that conductors will be exposed to excessive noise;

- Mlsna's amended complaint, in which he stated "Train Crewm[e]n work in a noisy environment and are therefore required to wear hearing protection;" and

- Mlsna's deposition, in which he acknowledged the importance that conductors wear appropriate hearing protection.

"Whether a function is essential is a question of fact, not law." *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 687 (7th Cir. 2020) (citing *Brown v. Smith*, 827 F.3d 609, 613 (7th Cir. 2016)). "We usually do not 'second-guess the employer's judgment in describing the essential requirements for the job.' But this deference is not unqualified." *Id*. (quoting *DePaoli v. Abbott Labs.*, 140 F.3d 668, 674 (7th Cir. 1998). Our examination of this record yields fact questions as to whether wearing hearing protection is an essential function of Mlsna working as a conductor.

Union Pacific's job description for train crew includes the position of conductor, and it lists essential job functions. While a hearing acuity requirement is not included, some of the functions do involve hearing. The job description includes accountabilities ("[c]ommunicating clearly with co-workers and train dispatchers via radio"), preferred education, training, experience or skills ("[a]ctive [l]istening: [a]ttending to and understanding key pieces of spoken information"), and work conditions ("[m]ust wear personal protection equipment such as … hearing protection where the company requires.") If the only evidence on this topic were the job description, the district court's conclusion that wearing hearing protection is an essential function of working as a conductor would not be "second guessed."

But the regulatory requirement to use hearing protection exposes a factual dispute. The default rule under the hearing protection regulation, 49 C.F.R. § 227.115(d), requires employees to wear hearing protection if they are exposed to a time-

weighted average of 90 decibels or higher. On this standard, the only evidence which shows the sound level that Union Pacific conductors are exposed to is a dosimetry data set that stretches back to 1980.[3] That data was collected using representative personal sampling under 49 C.F.R. § 227.103(b)(2). That dosimetry data shows that about 36% of the conductors (62 of 172) were exposed to an 8-hour time weighted average of 85 decibels or greater, and about 13% (22 of 172) were exposed to an 8-hour time weighted average of 90 or more decibels.

Mlsna points out that "[t]he single most recent measurement meeting or exceeding the 90-decibel threshold was taken in 2001." According to Mlsna, all measurements taken before 2007 should be disregarded because that year the Federal Railroad Administration began mandating the use of quieter locomotives. If Mlsna's suggestion is followed, no conductors in his position would be subject to an 8-hour time weighted average of 90 decibels or higher, and the hearing protection regulation would not apply to him. Union Pacific disagrees and recommends that the entire data set be considered instead of accepting Mlsna's "novel theory" of reviewing some but not all the data.

We decline to adopt Mlsna's suggestion that the analysis be limited to data after 2007. Doing so would require that a

---

[3] A noise dosimeter is a specialized sound level meter that measures a person's exposure to noise over a period of time. It can be used to assess compliance with health and safety regulations such as the occupational noise exposure standard of the Occupational Safety and Health Act, 29 C.F.R. 1910.95. It measures and stores sound pressure levels and provides a cumulative noise-exposure reading for a given period of time, such as an 8-hour workday.

bright line be drawn without the guidance of expert testimony. Mlsna is correct, however, that much of the data Union Pacific provided are not relevant, and reasonable inferences from the data run in Mlsna's favor as the nonmovant on whether the hearing protection regulation applies to him.

Under the 90-decibel threshold detailed in 49 C.F.R. § 227.115(d), railroads must "require the use of hearing protectors" only "when an employee *is* exposed to sound levels equivalent to an 8-hour [time weighted average] of 90 d(B)(A) or greater." (emphasis added). The term "is" in the regulation must be read with a meaning it can bear. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 31 (2012). "Is" denotes the present tense. *See* Merriam-Webster Dictionary, *Is*, https://www.merriam-webster.com/dictionary/is (last visited August 20, 2020); *see also Stanton v. Paul Revere Life Ins. Co.*, 37 F. Supp. 2d 1159, 1166 (S.D. Cal. 1999) (noting "is" as the present tense). The dosimetry data provided by Union Pacific are only relevant to the extent they show whether conductors at the time of Mlsna's termination were exposed to a time-weighted average of 90 decibels or higher. But "is" is not "was."[4] Fourteen years elapsed between the last data point showing a conductor for Union Pacific was exposed to a time-weighted average of more than 90 decibels in 2001, and Union's Pacific's decision to not recertify Mlsna in 2015. The data show no dangerous noise levels to which Mlsna was exposed in his time as a conductor. So a reasonable fact finder could conclude that if

---

[4] While, for example, the Dictionary Act states "words used in the present tense include the future tense as well as the present," 1 U.S.C. § 1, it does not state that words used in the present tense also include the past tense.

Mlsna was never exposed to that noise level, Union Pacific's more stringent policy of 85 decibels over the same time frame does not mandate that Mlsna wear hearing protection.

While a bright line does not separate obsolete data points from useful ones, the representative sampling dosimetry data permit a reasonable jury to conclude that when Mlsna was terminated in 2015, conductors working for Union Pacific were not exposed to time-weighted averages of 90 decibels or higher. Simply put, a genuine fact issue exists as to whether the data are a basis for the hearing conservation policy to apply to Mlsna. He was not even hired as a conductor by Union Pacific until 2006, five years after the last data showing a conductor for Union Pacific was exposed to a time-weighted average of more than 90 decibels.

Mlsna argues that by including measurements from before 2000, the railroad places its thumb on the scale to present dosimetry data falling within the regulation's parameters. Union Pacific calls this "historical monitoring," which is done to achieve statistical significance; that is, to show the data are not due to random or chance events. But drawing all reasonable inferences in Mlsna's favor, *Scheidler*, 914 F.3d at 540, sampling that includes measurements from over 20 and 30 years ago is not "representative" of Mlsna's noise exposure or the exposures of other conductors who operate similar equipment under similar conditions.

Mlsna's pleading or deposition responses do not support summary judgment for the railroad either. Mlsna's admission in his amended complaint that hearing protection is required, and his deposition statement that hearing protection is important, just echo the Federal Railroad Authority regulations. Even if those regulations capture the essential functions of the

conductor job generally, there are genuine issues of material fact as to whether Union Pacific's more stringent policy was an essential function of Mlsna's position.

A job function also may be considered essential because "the position exists … to perform that function." 29 C.F.R. § 1630.2(n)(2)(i). But nobody would argue the reason the position of conductor exists is to wear hearing protection. A fact question exists as to whether hearing protection was part of serving as a conductor for Union Pacific. Mlsna testified that while he worked as a conductor he wore his hearing aids without earmuffs or other hearing protection, and that he never saw anybody else wear earmuffs. His former supervisor testified to the contrary, averring that Mlsna always wore hearing protection when required. This fact dispute further cuts against summary judgment for Union Pacific on this topic.

The parties also dispute whether the essential function of a conductor should be considered more narrowly—as whether Mlsna met the hearing acuity standards while wearing hearing protection. But if characterized that way, then the grant of summary judgment to Union Pacific has even less support. The district court concluded that meeting the hearing acuity standards while wearing hearing protection was an essential function of the conductor job. But the plain text of the hearing acuity regulation does not mention wearing hearing protection. Rather, the hearing test must show, without qualification, that "[t]he person does not have an average loss in the better ear greater than 40 decibels with or without the use of a hearing aid, at 500 Hz, 1,000 Hz, and 2,000 Hz." 49 C.F.R. § 242.117(i). If the hearing acuity regulation was meant to require hearing protection, it could have said so, but it does

not. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another … it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.")

This case presents a two-edged problem. The regulations require that conductors have hearing acuity, as well as that their hearing be protected and conserved. But from this record it does not appear that Union Pacific can test hearing acuity under noisy working conditions. The railroad does not have dosimetry data that encompass the generation of locomotives currently in use or a plaintiff such as Mlsna. So on this record it does not follow as a matter of law that an essential function of Mlsna's job as a conductor was to pass the hearing acuity test while wearing compliant hearing protection.

Whether the essential function is defined as Mlsna wearing hearing protection, or Mlsna passing the hearing test while wearing hearing protection, the analysis leads to the same conclusion: this record presents questions of fact.

### B. Reasonable Accommodation

In addition to a claim of disparate treatment, Mlsna's complaint can be read as seeking a reasonable accommodation from Union Pacific as to his hearing disability. Recall that when Mlsna's hearing was tested, one of the iterations included him wearing an amplified hearing protection device called the Pro Ears–Gold. Union Pacific did not identify any alternatives to the Pro Ears–Gold. Mlsna proposed he use a custom-made hearing protection called the E.A.R. Primo. Union Pacific rejected his proposal because that device did not

have a factory-issued or laboratory-tested noise reduction rating, as required by 49 C.F.R. Pt. 227 App. B.

Federal labor regulations define "reasonable accommodation" as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held … is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position … ." 29 C.F.R. § 1630.2(o)(1)(ii). The district court rejected Mlsna's argument that Union Pacific failed to reasonably accommodate his hearing disability. The court concluded that the railroad's rejection of the E.A.R. Primo was reasonable, and that Union Pacific cannot be held responsible for the breakdown of the "interactive process."[5]

This reasonable accommodation evaluation is affected by the essential function analysis. As concluded above, fact issues exist as to whether Mlsna was subject to the hearing protection regulation, § 227.115. If it does not apply to Mlsna, neither would the requirement that a device considered for reasonable accommodation include a published noise reduction rating. That is, if Mlsna is not within the requirement of § 227.115(d), then the narrow attenuation rules of Pt. 227 App. B. do not apply. This means that the reasonable accommodation assessment here was artificially restrained. Curtailing the

---

[5] The definition of "reasonable accommodation" includes: "To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, *interactive process* with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3) (emphasis supplied).

search was the conclusion that the hearing protection regulation necessarily applied. Union Pacific rejected all devices other than the Pro Ears–Gold, possibly based on an overly-broad interpretation of the hearing protection regulation. Because Union Pacific doggedly insisted that the device it considered have a published noise reduction rating to determine noise attenuation, the Pro Ears–Gold device was the only device the railroad considered. Without that constraint, Union Pacific could offer more than just the Pro Ears–Gold device to accommodate Mlsna, and a reasonable jury could find that Union Pacific could offer more than it did as a reasonable accommodation.

Potential reasonable accommodations were not considered which could have permitted Mlsna to wear hearing protection while also meeting the requirements of the hearing acuity regulation. There is no shortage of devices without published noise reduction ratings which could be considered as possible accommodations for Mlsna's disability, whether the E.A.R. Primo or others. Once an employee commences the interactive process to find a reasonable accommodation, employers have an "affirmative obligation to seek the employee out and work with her to craft a reasonable accommodation." *EEOC v. Sears Roebuck & Co.*, 417 F.3d 789, 807 (7th Cir. 2005) (citation and internal brackets omitted). Viewing the evidence in the light most favorable to Mlsna, if 49 C.F.R. § 227.115(d) may not apply to him, then a material factual dispute exists as to whether Union Pacific satisfied its duty to craft an accommodation, and a reasonable jury could find that Mlsna may have been accommodated with other devices. Whether Union Pacific fulfilled its obligation to provide Mlsna with a reasonable accommodation of his hearing disability can be

addressed on remand without the constraint that the accommodating device carry a published noise reduction rating.

The record reveals another fact question on this point. Union Pacific told Mlsna that it engaged in an "extensive search" for adaptive devices, but discovery showed that no such search occurred. The railroad's director of disability management asked others to look for other devices for Mlsna, but the chief medical officer said he did not do so, and the senior manager of industrial hygiene said he had no responsibility to look for other devices. So after Union Pacific rejected Mlsna's proposal of the E.A.R. Primo, nobody at the railroad took any additional steps to explore reasonable accommodations.

Because genuine issues of fact exist as to whether Union Pacific reasonably accommodated Mlsna's hearing disability, Union Pacific should not have received summary judgment, and this case should return to the district court for further proceedings on this determination as well. On remand of the reasonable accommodation evaluation, at least three topics warrant consideration.

The first concerns the district court's application of a pretext analysis in its reasonable accommodation evaluation. Pretext is the third step in the three-step burden shifting process established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804–07 (1973). This Court has held that "the *McDonnell Douglas* burden-shifting method of proof is unnecessary and inappropriate" in a failure-to-accommodate claim. *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1283–84 (7th Cir. 1996); *see also Lenker v. Methodist Hosp.*, 210 F.3d 792, 799 (7th Cir. 2000) ("Because Lenker's claim was based on reasonable accommodation … the district court was correct to reject Lenker's proposed pretext instruction."); *Weigel v. Target*

*Stores*, 122 F.3d 461, 464 (7th Cir. 1997) ("[I]n failure to accommodate claims the *McDonnell Douglas* framework is 'unnecessary and inappropriate.'"). Instead, "if the plaintiff demonstrated that the employer should have reasonably accommodated the plaintiff's disability and did not, the employer has discriminated under the ADA and is liable." *Lenker*, 210 F.3d at 799. While evidence of pretext may be relevant in such a case, a pretext analysis need not be part of the reasonable accommodation evaluation.

The second involves the railroad's obligation to engage in an interactive process with the disabled individual to determine an appropriate reasonable accommodation. During such a process, the defendant employer must consider more than just what the plaintiff employee proposes. *EEOC v. Sears*, 417 F.3d at 807 (noting an employer's duty to work with employee to "craft a reasonable accommodation"). A proposed accommodation is not limited to what the plaintiff introduced into the process, here the E.A.R. Primo. *Lawler v. Peoria Sch. Dist. No. 150*, 837 F.3d 779, 786-787 (7th Cir. 2016) (employer must do more than "s[i]t on its hands" when employee requests accommodation). Union Pacific was obliged to do more than just conclude that Mlsna's proposal must fail because it is contrary to the railroad's policy.

Third, the parties previously debated and the district court ruled on the timeliness of a supplemental expert report Mlsna submitted which referenced devices that would satisfy Union Pacific's hearing conservation policy. Given this remand, the court and the parties have a new opportunity to review that report and consider those other devices.

With these items noted, this case is returned to the district court for further consideration.

### III

For the reasons above, the grant of summary judgment to Union Pacific is REVERSED and this case is REMANDED for further proceedings consistent with this opinion.