In the

# United States Court of Appeals

### For the Seventh Circuit

No. 21-1646

CLARENCE LEWIS,

*Plaintiff-Appellant,*

*v.*

KUL B. SOOD, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 4:18-cv-04084 — **Sara Darrow**, *Chief Judge.*

ARGUED FEBRUARY 9, 2023 — DECIDED JANUARY 14, 2025

Before EASTERBROOK, HAMILTON, and LEE, *Circuit Judges.*

LEE, *Circuit Judge.* Clarence Lewis sued various medical
staff members at his prison and asserted that they violated the
Eighth Amendment by being deliberately indifferent to his
various health maladies. On appeal, he contends that the dis-
trict court abused its discretion in denying his motions for re-
cruited counsel. Lewis has not shown any reasonable likeli-
hood that recruited counsel would have made a difference in
the outcome of his claims against Dr. Kul Sood, Dr. Catalino

Bautista, Nurse Practitioner Lara Vollmer, or Health Care Unit Administrator Lois Lindorff. Accordingly, the judgment in their favor is affirmed. But because Dr. Dina Paul concedes (and rightfully so) that Lewis's appeal as to her has merit, we reverse the judgment in favor of Dr. Paul and remand for further proceedings.

## I.

### A. Factual Background

The following facts are undisputed. While Lewis was an inmate at Hill Correctional Center in Galesburg, Illinois from 2013 to 2018, he was treated for various ailments. Dr. Sood was the medical director of Hill from 2010 to 2016. Dr. Bautista replaced Dr. Sood as the medical director until the end of 2018. Nurse Vollmer also treated Lewis during his incarceration. And Administrator Lindorff responded to a single grievance about Lewis's diabetes medication in 2018.[1]

#### 1. Diabetes

Lewis was seen in the health care unit in March 2016 by Dr. Sood. Dr. Sood ordered a blood test, as well as five days of blood-glucose readings, to determine Lewis's daily fasting blood-glucose levels.

Within a week, Lewis attended a follow-up appointment with Dr. Sood. The doctor told Lewis that his glucose readings were recorded as 188, 192, 167, 172, and 152 milligrams per deciliter, which was abnormally high. Lewis admitted that he

---

[1] Lindorff did not participate in the direct treatment of inmates and had no authority to override a diagnosis or treatment determination made by a physician.

had a family health history of diabetes and that his sister was diabetic.

Based on those results, Dr. Sood advised Lewis to avoid sugary foods. In addition, he ordered a hemoglobin A1C (HA1C) blood test. An HA1C test measures a patient's average blood-sugar level over the preceding two to three months to determine whether a patient is diabetic. Lewis's HA1C level was 13.7, which indicated diabetes.

That same month, Nurse Vollmer examined Lewis. Lewis reported vision changes, numbness in his lower extremities, and fatigue. Based on Lewis's glucose readings and his complaints, she diagnosed the onset of Type 2 diabetes and prescribed insulin injections, along with glucose readings, twice daily. Nurse Vollmer ordered a follow-up appointment to evaluate Lewis's glucose readings and to determine whether to adjust his insulin dose. She referred him to an ophthalmologist due to his vision complaints. The next day, Dr. Sood told Lewis that he concurred with Nurse Vollmer's diagnosis and treatment plan.

Dr. Sood and Nurse Vollmer continued to treat Lewis's diabetes with insulin and eventually replaced it with an oral medication. After Dr. Bautista became medical director, he examined Lewis in November 2016 and found that Lewis's diabetes was controlled with medication.

According to Lewis, in May 2018, he went about a week without receiving his diabetes medication but did not experience any deleterious effects. Based on this, he surmised that the medical staff had misdiagnosed his diabetes condition. Nevertheless, he filed a complaint regarding the one-week delay. In response, Administrator Lindorff investigated the

claim, informed the grievance counselor that Lewis's medication had already been ordered, and told Lewis that he would be receiving the medication shortly.

### 2. Chronic Cough, Sinus Issues, and COPD

Dr. Bautista first treated Lewis for a sinus infection and cough in July 2016. He suspected that Lewis had an upper respiratory infection and that his cough was being exacerbated by his blood pressure medication. As a result, Dr. Bautista discontinued the medication and prescribed an antibiotic.

Nurse Vollmer examined Lewis the following month, and he told her that he had been coughing and experiencing nasal congestion for the past month. Based upon her examination, she diagnosed him with a cough, upper respiratory infection, and allergic rhinitis. She prescribed an antihistamine, a nasal spray, and an antibiotic. She also advised Lewis to drink more water.

Nurse Vollmer saw Lewis again a week later when he complained of being short of breath. She observed that Lewis was not in any acute distress and did not have a fever, chills, or sweats. He did, however, have a continuous, non-productive cough. Based on the examination, Nurse Vollmer concluded that Lewis had a persistent cough, history of tobacco use, allergic rhinitis, and heartburn. She ordered a chest X-ray to rule out pneumonia, renewed his prescriptions for his nasal spray, and prescribed Pepcid for heartburn. When the X-ray results became available, she reviewed them and ruled out pneumonia.

Dr. Bautista also examined Lewis for his cough in September 2016. He noted that Lewis had had a cough for several months and complained of shortness of breath when walking

long distances. The doctor also remarked that the chest X-ray had shown nothing out of the ordinary and that Lewis was not in distress and his lungs were clear. Based on this information, Dr. Bautista diagnosed Lewis with chronic obstructive pulmonary disease (COPD), a condition that blocks airflow and makes breathing difficult. He based this diagnosis on his examination of Lewis, as well as Lewis's subjective complaints and history of smoking tobacco. The doctor prescribed an Incruse Ellipta inhaler in order to control and prevent COPD symptoms.

Throughout the following months, Dr. Bautista and Nurse Vollmer continued to examine Lewis and treat his respiratory problems by prescribing allergy medications and nasal sprays, ordering blood tests, encouraging him to lose weight, and advising him to increase his water intake to 100 ounces per day. Dr. Bautista noted in November 2016, that Lewis's COPD was controlled, and he continued prescribing an inhaler. And in mid-January 2017, Lewis informed the health care unit that he had not coughed in three weeks after adhering to his medication regimen. This led Dr. Bautista to conclude that Lewis's cough symptoms had resolved. And, in March 2017, Nurse Vollmer prescribed a six-month supply of the same medications.

Despite this, Lewis believes he has been misdiagnosed with COPD because he no longer experiences any adverse symptoms. He would like to be admitted to a hospital so he can confirm his COPD diagnosis.

### 3. Irritable Bowel Syndrome

Lewis informed Dr. Bautista in January 2017 that he had experienced diarrhea for several weeks but believed the issue

was getting better. Upon examining Lewis, Dr. Bautista found that his abdomen was soft and non-tender with no irregularities. His assessment was that Lewis had diarrhea, but that it was improving.

According to Lewis's medical records, he next complained of diarrhea in May 2017. At that time, Lewis reported that he had bowel movements every fifteen minutes. Dr. Bautista admitted Lewis to the infirmary for observation, where he was monitored for twenty-four hours but did not experience diarrhea.

In July 2017, Lewis reported having diarrhea to Nurse Vollmer. Nurse Vollmer requested blood work and prescribed a regular course of Imodium.

Dr. Bautista followed up with Lewis three weeks later. Lewis told him that he had been experiencing rectal bleeding on and off for a year and had up to fourteen loose stools a day. Dr. Bautista conducted a rectal examination but found nothing abnormal. He also ordered fecal occult blood test that returned negative. Dr. Bautista noted that Lewis's blood test results over a six-month span indicated a loss in iron levels. As a result, Dr. Bautista assessed Lewis as having diarrhea, rectal fluid, and iron-deficiency anemia. The doctor ordered chest and abdominal X-rays, blood work, and a stool exam with a gastrointestinal panel to test for viruses, bacteria, and parasites. He also prescribed an iron supplement and requested a referral to a gastroenterologist for further recommendations; this request was approved.

In August 2017, Dr. Bautista met with Lewis to discuss his lab and X-ray results. Lewis reported he had diarrhea fourteen times a day and experienced abdominal cramps. Dr.

Bautista noted that Lewis's abdomen was soft and non-tender and that he had normal bowel sounds. He told Lewis that his lab results and X-ray were unremarkable and that he was scheduled for a gastroenterology consultation in September 2017. Dr. Bautista also prescribed medication to treat the diarrhea and cramps.

Dr. Bautista examined Lewis a week after the consultation and told Lewis that the gastroenterologist had recommended that he undergo a colonoscopy, an esophagogastroduodenoscopy (EGD), biopsies to rule out Celiac disease, a re-check of his blood panel, and the continuation of iron supplementation. Lewis did not report any additional symptoms at that time, and Dr. Bautista agreed to proceed with the gastroenterologist's plan, and that plan of care was also approved upon review.

Although the procedures were originally scheduled for October 2017, the hospital had to reschedule the appointment. As a result, Lewis underwent a colonoscopy, EGD, and biopsies at Pekin Hospital in December 2017.

After the procedures, Dr. Bautista met with Lewis again to examine him and explain the results of the diagnostic tests, which were unremarkable. Lewis reported a recurrence of loose stools three days prior to this visit, and Dr. Bautista prescribed Imodium.

In January 2018, Dr. Bautista examined Lewis again, and Lewis told him that the Imodium had helped his diarrhea. Lewis's abdomen was soft and non-tender, and Dr. Bautista found everything to be normal. As a result, Dr. Bautista prescribed Imodium twice a day as needed. Dr. Bautista also

replaced Lewis's oral diabetes medicine with a different one in case that it was contributing to his diarrhea.

Dr. Bautista saw Lewis again two weeks later, and Lewis told him he had occasional loose stools and abdominal pain. Dr. Bautista informed Lewis that his gastrointestinal panel showed no abnormalities and that his colonoscopy and EGD results were within normal limits. Nevertheless, Dr. Bautista ordered a CT scan of Lewis's abdomen, which was performed at Cottage Hospital in March 2018.

Dr. Bautista then met with Lewis again in early April to discuss his CT scan. According to Lewis, he was still experiencing soft stool. Upon examination, Dr. Bautista found that Lewis's abdomen was soft and non-tender and exhibited normal bowel sounds. After considering the relevant factors, Dr. Bautista diagnosed Lewis with irritable bowel syndrome and prescribed Imodium and ibuprofen.

Dr. Bautista's final assessment of Lewis occurred in May 2018. Lewis again complained of loose stools. Dr. Bautista examined him again and noted that Lewis was not in acute distress and that the condition of his abdomen had not changed. Dr. Bautista's opinion was that Lewis suffered from diarrhea and irritable bowel syndrome, for which he prescribed Imodium.

### 4. Hepatitis C

Lewis asserts that, at some point after 2013, Dr. Paul diagnosed him with Hepatitis C. Dr. Paul informed him that she would check on him every six months to see if his condition was affecting his liver.

Lewis asked Dr. Paul why she was not prescribing medication to treat his condition, and she explained that the

medication was costly, that he did not meet the guidelines for eligibility, and "that's how it goes when you are in prison." According to Lewis, when he emphasized that Dr. Paul would rather save a dollar than a life, she repeated, "that's how it is."

**B. Procedural History**

In his lawsuit, Lewis alleges that Dr. Sood, Nurse Vollmer, and Dr. Bautista misdiagnosed him as having diabetes and COPD and mistreated him for these ailments. He also claims that Lindorff should have expedited the delivery of his diabetes medication after reviewing his grievance. Furthermore, he contends that Dr. Bautista improperly delayed his colonoscopy procedure and that Dr. Bautista and Nurse Vollmer failed to provide effective medical treatment for his bowel disorder. These failures, according to Lewis, violated his Eighth Amendment rights.

Additionally, Lewis asserts that Dr. Paul was deliberately indifferent to his Hepatitis C condition when she denied him medication on the ground that he did not meet the guidelines for such treatment.

During the litigation, Lewis filed numerous motions for recruitment of counsel. The district court denied each motion and explained that Lewis had demonstrated an ability to represent himself and that it appeared that he was able to obtain relevant documents in discovery.

After discovery, the defendants moved for summary judgment. The district court granted summary judgment in favor of Dr. Sood, Dr. Bautista, Nurse Vollmer, and Administrator Lindorff, after concluding that no reasonable juror could find that they had acted with deliberate indifference to Lewis's serious health conditions.

The court also granted summary judgment in Paul's favor but on different grounds. Lewis had raised a similar claim in a prior lawsuit, although against different defendants, *see Orr v. Elyea*, 2:08-cv-2232 (C.D. Ill.). Based on this, the district court believed that the rule against claim splitting foreclosed Lewis's claim.

Lewis appeals, arguing principally that the district court should have recruited *pro bono* counsel to assist him in this case.

## II.

### A. Standard of Review

We review the denial of a motion for recruitment of counsel for abuse of discretion. *Greeno v. Daley*, 414 F.3d 645, 658 (7th Cir. 2005). But even if a district court abused its discretion in denying counsel, "we will reverse only upon a showing of prejudice." *Pruitt v. Mote*, 503 F.3d 647, 659 (7th Cir. 2007). "[A]n erroneous denial of pro bono counsel will be prejudicial [only] if there is a reasonable likelihood that the presence of counsel would have made a difference in the outcome of the litigation." *Id.* (emphasis removed).

### B. Analysis

To support his argument that the district court abused its discretion by not providing him with an attorney, Lewis points to his learning disability and his sixth-grade-level reading and math scores. But even assuming that the district court erred, Lewis still must demonstrate that the error prejudiced him to prevail on appeal. For the moment, we will focus on his claims against Defendants Dr. Sood, Dr. Bautista, Nurse Vollmer, and Administrator Lindorff.

Lewis has given us no basis to conclude there is a reasonable likelihood that having an attorney would have altered the outcome of his claims against these defendants. Most conspicuously, he has not challenged the district court's determination that the undisputed facts show these defendants were not deliberately indifferent to his serious medical needs. Although Lewis contends that these defendants persisted in providing him with treatments known to be ineffective, he has not pointed to any evidence to support this contention.

For example, Lewis believes that Dr. Sood, Dr. Bautista, and Nurse Vollmer misdiagnosed him as having diabetes and COPD, but his sole basis for this claim is the lack of any current symptoms. By contrast, these diagnoses find ample support in Lewis's test results, family history, prior smoking, and his previous complaints of shortness of breath and a dry cough.

He also asserts that more could have been done to treat his irritable bowel syndrome. But the health care unit personnel followed the recommendations of Lewis's outside gastroenterologist, ordered a CT scan, consistently monitored Lewis's condition, and prescribed medication that, by Lewis's own admission, alleviated his symptoms.

On these facts, no rational jury could conclude that the treatments these defendants provided Lewis for his medical conditions were "blatantly inappropriate." *Greeno*, 414 F.3d at 654 (internal quotation marks omitted). Lewis's personal disagreement with his diagnoses and treatment, without more, is insufficient to fend off summary judgment. *Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021) ("It is not enough that the plaintiff simply believes the treatment was ineffective or disagrees with the doctor's chosen course of treatment."); *Pyles*

*v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("Disagreement be-tween a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment vi-olation.").

As for Administrator Lindorff, her interaction with Lewis was limited to investigating his grievance regarding the delay of his diabetes medication. It is undisputed that, as a Health Care Unit Administrator, she did not treat inmates and lacked authority to override any diagnosis or treatment determina-tion. What is more, Lewis admits that any delay in his diabe-tes medication had no deleterious effect on his well-being.

Given this factual record, providing Lewis with an attor-ney would have made no difference in the outcome of his claims against these four defendants. Thus, the judgment in favor of Dr. Sood, Dr. Bautista, Nurse Vollmer, and Adminis-trator Lindorff is affirmed.

Turning to Lewis's claim against Dr. Paul regarding his Hepatitis C condition, Lewis argues on appeal that the district court's application of claim splitting was erroneous. And Dr. Paul rightly concedes the point.

Dr. Paul raised this affirmative defense for the first time at summary judgment—sixteen months after Lewis had as-serted the claim against Dr. Paul (and over three years after he had filed his Hepatitis C-based claim in *Orr*). By waiting so long to raise this defense, Dr. Paul acquiesced in Lewis's as-sertion of the claim in this case. *See Lawler v. Peoria Sch. Dist. No. 150*, 837 F.3d 779, 785 (7th Cir. 2016) (holding that the de-fendant acquiesced to claim splitting when it waited eighteen months to raise it). Because remand is required on this ground

alone, we need not address the parties' alternative arguments. If this claim proceeds to trial, the district court in its discretion may wish to reconsider Lewis's request for recruitment of counsel.

For these reasons, the judgment in favor of Dr. Sood, Dr. Bautista, Nurse Vollmer, and Administrator Lindorff is AFFIRMED. The judgment in favor of Dr. Paul is VACATED, and this matter is REMANDED to the district court for further proceedings consistent with this opinion.